**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lopez QUINTERO, Defendant–Appellant.**

**No. 93–10217.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 14, 1993.

Decided April 7, 1994.

Fredric F. Kay, Federal Public Defender, Tucson, AZ, for defendant-appellant.

Charles L. Jenkins, Asst. U.S. Atty., Tucson, AZ, for plaintiff-appellee.

Before: LAY,[*] HALL and THOMPSON, Circuit Judges.

LAY, Senior Circuit Judge:

Lopez Quintero ("Quintero") was indicted for first degree murder of his two-year-old daughter, A.B.Q., on an Indian reservation in Arizona, under 18 U.S.C. §§ 1111, 1153 (1988). The trial court directed a verdict for Quintero on the first degree murder charge and instructed the jury regarding the lesser offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter. The jury found Quintero guilty of voluntary manslaughter in violation of 18 U.S.C. §§ 1112, 1153 (1988). Due to the defendant's conduct following the victim's death, the court upwardly departed from the sentence recommended by the Sentencing Guidelines and sentenced Quintero to 108 months in prison, plus 36 months of supervised release, a $2000 fine and $1300 in restitution. Quintero appeals the conviction and the upward departure. We affirm in part, vacate in part, and remand.

## I. BACKGROUND

Two days after A.B.Q. was born, her parents, Lopez Quintero and his wife, Gina Quintero, gave her to her maternal aunt and uncle for adoption. Before the adoption was completed, however, the aunt and uncle were involved in a serious automobile accident, leaving the uncle hospitalized for a one-month period. During this time, A.B.Q., then two years old, was returned to her natural parents. The Quinteros had three other children.

Testimony at trial indicated that on the morning of A.B.Q.'s death, Quintero and his four-year-old son, L.M.Q., were outside with A.B.Q. Quintero maintains that as he was pumping air into a tire of his pickup truck, A.B.Q. fell from the truck bed, where she had been playing with L.M.Q., and hit her head. The government contends that Quintero chased A.B.Q. and struck multiple blows to her head and body with his hand.[1] L.M.Q. was the sole witness.

Quintero carried A.B.Q., who was dazed but still breathing, inside and asked his wife to look after her. A short while later, Gina called out to Quintero that A.B.Q. had stopped breathing. Quintero revived her with mouth-to-mouth resuscitation and went back outside to work on the truck. A.B.Q. soon stopped breathing again and could not be revived.

Quintero refused to take his daughter to a hospital for fear that he and Gina would be

---

[*] Hon. Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

[1.] Testimony elicited at trial indicated that Quintero had beaten his wife and other children in the past. Because A.B.Q. had a vomiting problem, Quintero forbade his wife from feeding A.B.Q. while he was around. He also had hit A.B.Q. on several occasions with enough force to knock her down.

accused of child neglect and that their son would be taken from them. Instead, Quintero put A.B.Q.'s body, wrapped in a blanket, into the truck, and he, along with Gina and L.M.Q., drove out to find a place to bury her. Finding the ground too hard to dig, Quintero built a fire and burned A.B.Q.'s body. To avoid identification of the remains, he removed the head with a shovel and left it at a different location several miles away.

Authorities soon began an investigation into the whereabouts of the child. Eventually, Gina confessed and received a grant of immunity from prosecution in exchange for her willingness to testify against Quintero at trial. Quintero was indicted for first degree murder. L.M.Q. was allowed to testify at trial via closed-circuit television.

At the close of the evidence, the district court granted Quintero's motion for judgment of acquittal as to the charge of first degree murder. The court then submitted the case to the jury with instructions regarding second degree murder and, at defendant's request, voluntary and involuntary manslaughter. The jury found Quintero not guilty of second degree murder and guilty of voluntary manslaughter. At sentencing, the court departed from the Sentencing Guideline range calculated for Quintero of 70 to 87 months and sentenced Quintero to 108 months in prison, based upon Quintero's treatment of A.B.Q.'s body after her death. This appeal followed.

## II. DISCUSSION

### A. Voluntary Manslaughter

Quintero first argues that the evidence was insufficient to support a conviction for voluntary manslaughter. Quintero contends that there was no evidence of any heat of passion or provocation, and that therefore, since the jury determined that Quintero was not guilty of murder, the only crime he could be guilty of is involuntary manslaughter. We disagree.

■ In reviewing the sufficiency of the evidence supporting Quintero's conviction,

our role is limited. We must determine only whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of voluntary manslaughter beyond a reasonable doubt. *Dallas v. Arave,* 984 F.2d 292, 295 (9th Cir.1993); *see Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Voluntary manslaughter is defined as "the unlawful killing of a human being without malice.... [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a) (1988). Quintero contends that the government must prove "sudden quarrel or heat of passion" as an essential element of the crime before a defendant can be convicted of voluntary manslaughter and that it failed to do so.[2]

■ Quintero's argument fails to recognize the government's contention that Quintero was guilty of murder, and not a lesser included offense. Voluntary manslaughter is a lesser included offense within the crimes of first and second degree murder. *United States v. Roston,* 986 F.2d 1287, 1290 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 206, 126 L.Ed.2d 163 (1993); *United States v. Celestine,* 510 F.2d 457, 460 (9th Cir.1975). Under Federal Rule of Criminal Procedure 31(c), a defendant may be found guilty of an offense with which he was not charged only if it is "necessarily included" within the charged offense. To be "necessarily included," the elements of the lesser offense, voluntary manslaughter, must be a subset of the elements of the greater offense, murder. *See Schmuck v. United States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989); *United States v. Garcia,* 7 F.3d 885, 890 (9th Cir.1993). Manslaughter is thus distinguished from murder, which the law defines as "the unlawful killing of a human being with malice aforethought," 18 U.S.C. § 1111(a) (1988), by the *absence* of malice, one of murder's essential elements. *United States v. Wagner,* 834 F.2d 1474, 1487 (9th Cir.1987), *cert. denied,* —— U.S. ——, 114 S.Ct. 1110, 127 L.Ed.2d 420 (1994).

---

**2.** Quintero points to the government's closing argument at trial, in which the prosecuting attorney told the jury that there exists "simply no

evidence" that A.B.Q. was killed in the heat of passion.

When a defendant charged with murder introduces evidence of sudden quarrel or heat of passion, the evidence acts in the nature of a defense to the murder charge. *See id.; United States v. Alexander,* 471 F.2d 923, 943 (D.C.Cir.1973). The defendant attempts to negate the malice element by claiming, in essence, that she was not acting maliciously because some extreme provocation, beyond what a reasonable person could be expected to withstand, severely impaired her capacity for self-control in committing the killing. *See Wagner,* 834 F.2d at 1487. Once such evidence is raised, the burden is on the government to prove beyond a reasonable doubt the *absence* of sudden quarrel or heat of passion before a conviction for murder can be sustained. *United States v. Lesina,* 833 F.2d 156, 160 (9th Cir.1987); *see Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975).

It is *not,* however, the burden of the government to also prove the *presence* of sudden quarrel or heat of passion before a conviction for voluntary manslaughter can stand in a murder trial. *See Alexander,* 471 F.2d at 942–43. When a defendant is charged with murder, a conviction for the lesser included offense of voluntary manslaughter means that the government failed to prove all of murder's essential elements. *See Beck v. Alabama,* 447 U.S. 625, 633, 100 S.Ct. 2382, 2387, 65 L.Ed.2d 392 (1980) (stating that conviction for lesser included offense occurs "in cases in which the proof failed to establish some element of the crime

charged"). To require the government to prove sudden quarrel or heat of passion in such circumstances would impermissibly add to the "subset" of elements that makes up the lesser included offense. *See Schmuck,* 489 U.S. at 716, 109 S.Ct. at 1450. It could also lead to "the ludicrous result that a jury which finds the evidence in balance on the question of provocation can convict the defendant *neither* of second degree murder *nor* of manslaughter." *Alexander,* 471 F.2d at 942. This the law does not require. *Id.* at 942–47.

To convict a defendant charged with murder of voluntary manslaughter, the government must prove that (1) the defendant intentionally inflicted an injury upon another from which the other died; and (2) the homicide was committed without justification or excuse. *Id.* at 947; *accord United States v. Holmes,* 632 F.2d 167, 170 (1st Cir.1980) (per curiam). Intent without malice, not the heat of passion, is the defining characteristic of voluntary manslaughter. *See Alexander,* 471 F.2d at 947 n. 56; *see also* 2 Charles E. Torcia, *Whorton's Criminal Law* § 153 (14th ed. 1979) (observing that voluntary manslaughter is "an intentional killing" where the heat of passion takes the place of malice). If malice is proven, the crime becomes second degree murder, *Wagner,* 834 F.2d at 1487; if intent is not proven, the crime becomes involuntary manslaughter,[3] *Alexander,* 471 F.2d at 947 n. 56; *see United States v. Skinner,* 667 F.2d 1306, 1309–10 & n. 1. (9th Cir.1982) (recognizing that involuntary manslaughter is a lesser in-

---

3. The court in *Alexander* suggested the following instruction to clarify the difference between voluntary and involuntary manslaughter in a murder trial:

> If you find that the defendant inflicted the fatal injury intentionally or voluntarily, it is not a defense to manslaughter that the injury was inflicted in heat of passion caused by provocation.
>
> On the other hand, if you find that the defendant inflicted the injury unintentionally or involuntarily, then he may be found guilty of manslaughter only if the fatal injury resulted from recklessness in conduct involving extreme danger of death or serious bodily injury and gross deviation from the standard of conduct that a reasonable man would observe.

471 F.2d at 947 n. 56. The instruction illustrates well that involuntary manslaughter is differenti-

ated from voluntary manslaughter not by the absence of the heat of passion (passion serves only to negate malice), but by the absence of *intent.*

In barest form, the homicide offenses included within first degree murder may be outlined as containing the following "subsets" of elements:
1. First degree murder: Premeditation, malice aforethought, intent, unlawful killing;
2. Second degree murder: Malice aforethought, intent, unlawful killing;
3. Voluntary manslaughter: Intent, unlawful killing;
4. Involuntary manslaughter: Unlawful killing.

*See generally United States v. Browner,* 889 F.2d 549, 551–53 (5th Cir.1989) (describing elements in greater detail).

cluded offense of murder and voluntary manslaughter, and stating that "[i]nvoluntary manslaughter is an unintentional homicide"), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983). Sudden quarrel or heat of passion are simply not essential elements of voluntary manslaughter, and therefore, they need not be proven by evidence beyond a reasonable doubt.[4] *Alexander,* 471 F.2d at 943.

■■■■ In order to obtain a jury instruction regarding voluntary manslaughter in a murder trial, a defendant must demonstrate to the court that sufficient evidence exists to allow a reasonable jury to conclude that the defendant was acting out of passion rather than malice. *Roston,* 986 F.2d at 1290–91. The defendant in this case succeeded in making that showing. In so doing, he did not waive his right to now challenge the sufficiency of the evidence that led to his conviction. Our role on appeal, however, is confined to determining whether a jury could reasonably find that the government presented sufficient evidence to conclude beyond a reasonable doubt that the defendant intentionally committed an unexcused killing of a human being. We believe that it could.

From the jury's verdict, it is apparent that the jury concluded that the government had established beyond a reasonable doubt that Quintero intentionally killed his daughter without excuse or justification. It is also apparent that the jury did not believe beyond a reasonable doubt that Quintero acted with malice aforethought. The evidence supports these findings. The jury heard testimony from Quintero's wife, Gina, that Quintero had a history of beating A.B.Q. and that after he carried her inside on the day she received her fatal injury, Quintero promised A.B.Q. that he would never lay a hand on her again.

Gina also testified that when she asked A.B.Q., "Who's mean at you?," she replied, "Daddy." Later, when Gina and Quintero fought about going to the police, Gina testified that Quintero told her that he had killed A.B.Q.—and that he then corrected himself to say it was an accident. At one point, Quintero allegedly threatened to "do the same thing" to Gina and their son L.M.Q. as he had done to A.B.Q.

The sole eyewitness to the incident by the pickup truck, L.M.Q., testified that Quintero had hit A.B.Q. with his hand, and that A.B.Q. fell to the ground with her nose bleeding. After she fell, L.M.Q. testified, she was dead. When specifically asked what happened to A.B.Q., L.M.Q. testified, "My dad kill her." He drew a picture, which was admitted into evidence, illustrating what he saw.

In addition, the jury heard testimony casting doubt on Quintero's version of the events. Quintero claimed that A.B.Q. was injured when she fell from the back of the truck. A forensic pathologist testified, however, that there were no well-documented cases of fatal injuries to children caused by falls from the height of a pickup truck bed. While agreeing that such injuries were not absolutely impossible, the expert testified that "it would be extremely rare and extremely unlikely."

This review of the evidence is by no means exhaustive. It demonstrates, however, that a rational jury could have found beyond a reasonable doubt that Quintero intentionally killed A.B.Q. At the same time, there was very little evidence of Quintero's state of mind at the time of the killing. The government argued at trial that he acted with malice, claiming that it was "just not possible" for a two-year-old child to provoke the "heat of passion" adequate to cause a reasonable

---

4. We recognize that there exists some tension between this conclusion and the apparent language of the statute and the common law understandings of voluntary manslaughter. Nonetheless, we are guided by the following passage from *Schmuck:*

> It is ancient doctrine of both the common law and of our Constitution that a defendant cannot be held to answer a charge not contained in the indictment brought against him. This stricture is based at least in part on the right of the defendant to notice of the charge brought against him. Were the prosecutor able to request an instruction on an offense whose elements were not charged in the indictment, this right to notice would be placed in jeopardy.... The elements test ... permits lesser offense instructions only in those cases where the indictment contains the elements of both offenses and thereby gives notice to the defendant that he may be convicted on either charge.

489 U.S. at 717–18, 109 S.Ct. at 1451–52.

person to lose control. For his part, Quintero argued that the death was accidental, but he requested the voluntary manslaughter instruction because "the Government's theory in this case is that Mr. Quintero got mad at this little girl and hit her. And if that's true, that's a sudden rage, and it could be voluntary also." Quintero did not have to prove the alleged sudden quarrel or heat of passion; once the issue was introduced and the instruction granted, the government had the burden to prove the absence of a sudden quarrel or heat of passion beyond a reasonable doubt. *Lesina*, 833 F.2d at 160. The lack of evidence as to what Quintero's state of mind actually was could allow a reasonable jury to conclude that sufficient doubt existed about the heat of passion to prevent the government from meeting its burden. The voluntary manslaughter verdict would then be appropriate. *See Alexander*, 471 F.2d at 945 n. 54. Because a rational jury could have reached the result obtained here, we affirm.

## B. L.M.Q.'s Closed–Circuit Testimony

■■■ Quintero next contends that L.M.Q.'s testimony should have been excluded as violative of his Sixth Amendment confrontation rights, because it was given ·by closed-circuit television. He argues that the court did not make the specific findings required by 18 U.S.C. § 3509(b)(1) (Supp. IV 1992), which authorizes closed-circuit testimony by children.[5] Our review of the record, however, shows that the court did make the specific findings necessary to satisfy § 3509, as we have outlined those requirements in *United States v. Garcia*, 7 F.3d 885 (9th Cir.1993). The district court considered expert testimony as to the likely effect of testifying, and after reviewing the particular facts of the case, concluded that the child would be unable to testify in open court due to the presence of the defendant. *See id.* at

887. The court stated that "there's a substantial likelihood that the child would suffer emotional trauma from testifying." As we said in *Garcia*, "[i]t is implicit in [this] finding that the resulting emotional trauma would also prevent the witness from giving meaningful testimony." *Id.* at 889 n. 1. We thus see no reason to reverse the admission of L.M.Q.'s testimony on these grounds.

■■■ Quintero also urges, for the first time on appeal, that § 3509 authorizes closed-circuit testimony only by children who are *victims*, not witnesses. This claim was not raised in the district court, and consequently, we review only for plain error. *United States v. Benny*, 786 F.2d 1410, 1417–18 (9th Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). We find none here. " 'A plain error is a highly prejudicial error affecting substantial rights.' " *United States v. Dischner*, 974 F.2d 1502, 1515 (9th Cir.1992) (citation omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993). If the district court erred at all, it did not affect Quintero's substantial rights. In *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Supreme Court explained that " 'the Confrontation Clause reflects a·*preference* for face-to-face confrontation at trial,' a preference that 'must occasionally give way to considerations of public policy and the necessities of the case,' " *id.* at 849, 110 S.Ct. at 3165 (citations omitted). The Court held that "the state interest in protecting child witnesses from the trauma of testifying" is sufficiently important to justify procedures that depart from face-to-face confrontation with the defendant. *Id.* at 855, 110 S.Ct. at 3168. Allowing L.M.Q. to testify by closed-circuit television, after the trial court specifically found that testifying in court would be

---

**5.** The provision states in pertinent part:
(B) The court may order that the testimony of the child be taken by closed-circuit television ... if the court finds that the child is unable to testify in open court in the presence of the defendant, for any of the following reasons:
 (i) The child is unable to testify because of fear.

 (ii) There is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying. .
 ·· ...
(C) The court shall support a ruling on the child's inability to testify with findings on the record....
18 U.S.C. § 3509(b)(1) (Supp. IV 1992).

traumatic for him, was not plain error.[6] We therefore affirm.

## C. *Expert Testimony*

■ Quintero also appeals the district court's rejection of his attempt to introduce an expert to testify as to Quintero's "thinking process following the death in this case." He claims that the testimony would have served to rebut the evidence offered by the prosecution regarding Quintero's actions after A.B.Q.'s death. We review the district court's decision to exclude expert testimony only for manifest error or abuse of discretion. *United States v. Dorotich*, 900 F.2d 192, 194 (9th Cir.1990); *see United States v. Rahm*, 993 F.2d 1405, 1410 (9th Cir.1993) (noting that there is "no practical difference" between the two standards).

The district court sustained the government's motion to preclude the expert testimony, because, in the court's words, "the jury [was] well situated to make a decision" on the defendant's claims without the expert testimony. As we stated in *Rahm*, this circuit continues to guard "from expert elucidation, areas believed to be within the jurors' common understanding." 993 F.2d at 1413. Quintero has not demonstrated that the court's conclusion was manifestly erroneous or an abuse of discretion.

## D. *The Upward Departure in Sentencing*

Finally, Quintero claims that the district court erred in relying on Quintero's conduct after the death of A.B.Q. as the basis for departing upward from the sentencing range determined for him under the Sentencing Guidelines. Quintero contends that his post-death acts do not qualify as "extreme conduct" under Sentencing Guideline § 5K2.8 and that the court gave no reasoned justification for the extent of its departure.

■ When reviewing a sentence outside the applicable Guideline range, we conduct a three-step inquiry. *United States v. Lira–Barraza*, 941 F.2d 745, 746 (9th Cir.1991) (en banc). First, we determine whether the district court had the legal authority to depart; second, we review for clear error the factual findings in support of the aggravating circumstances identified by the district court as

the basis for departure; and third, we review the reasonableness of the extent of the departure in light of the structure, standards and policies of the Sentencing Guidelines and the legislation establishing them. *United States v. Hicks*, 997 F.2d 594, 597 (9th Cir. 1993).

### 1. Legal Authority

■ A district court is statutorily authorized to depart from a Guideline range if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988); *Lira–Barraza*, 941 F.2d at 746. If the court makes such a finding, it may then legally depart provided that doing so would be consistent with the sentencing factors prescribed by Congress in 18 U.S.C. § 3553(a), with the Guidelines, and with the Constitution. *Id.*

In this case, the district court stated that it was departing upward from the Guideline range "based on the treatment of the victim after the death, both the severing of her head, the burning of her body, and the whole business of the traveling around trying to hide it. . . . It just shows something other than a pure accident." The Guidelines do not specifically take this sort of conduct into consideration in setting the sentencing ranges for voluntary manslaughter. Moreover, although the court does not specifically refer to the Guidelines, it is clear that departure based upon the defendant's conduct here is consistent with them.

■ In Sentencing Guideline § 5K2, the Sentencing Commission enumerates "some of the factors," U.S.S.G. § 5K2.0 (policy statement), that courts may consider in departing from a Guideline range. Pursuant to 18 U.S.C. § 3553(a)(5) (1988), these factors, listed as policy statements, are relevant to the imposition of a sentence. The policy statement most relevant to Quintero's sentence is Guideline § 5K2.8, entitled "Extreme Con-

---

**6.** We note that the district court further protected the defendant's substantial rights by cautioning the jurors as to the suggestibility of children

and the use of leading questions in examining them.

duct," which states that upward departure may be warranted "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." Quintero contends that § 5K2.8 applies only to conduct inflicted on a live victim and thus provides no basis for departure as a result of his actions after A.B.Q.'s death. As we read the provision, however, we see no such limitation. *See United States v. Roberson,* 872 F.2d 597, 604–05 (5th Cir.), *cert. denied,* 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989).[7] The section focuses on the defendant's conduct, not the characteristics of the victim.[8] *Id.*

Even if § 5K2.8 is limited to live victims, however, the list of policy statements in § 5K2 justifying upward departure is explicitly non-exclusive—§ 5K2.0 states that "[a]ny case may involve factors in addition to those identified that have not been given adequate consideration by the Commission." Here, there is no evidence that the Commission considered acts as extreme as those committed by the defendant when it set the sentencing ranges for voluntary manslaughter. *See* U.S.S.G. § 2A1.3. Consequently, the court could properly conclude that the defendant's conduct is a "circumstance" that "should result in a sentence different from that described." *See* 18 U.S.C. § 3553(b); *cf. Hicks,* 997 F.2d at 598 (approving departure where Guideline under which defendant was sentenced did not evidence Commission's consideration of defendant's activities). On this basis, we find that the court did have the legal authority to depart.

## 2. Factual Findings

The factual findings underlying the court's determination of aggravating circumstances are not disputed. Quintero challenges the significance of his actions, but not that they occurred as the district court found. The district court cannot be faulted for finding the actions extreme or heinous.

## 3. Extent of Departure

▮ Although we conclude that the district court had the legal authority to depart and that its factual findings are not in dispute, we nonetheless must vacate the sentence and remand based upon the inadequacy of the court's explanation for the extent of its departure. In reviewing for reasonableness the extent of a departure from a Guideline range, this circuit has rejected a "pure common law approach" to the issue. *Hicks,* 997 F.2d at 599 (quoting *United States v. Streit,* 962 F.2d 894, 903 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992)). Instead, we require a district court to explain the extent of its departure with reference to the structure, standards, and policies of the Act and the Guidelines. *Id.; Lira–Barraza,* 941 F.2d at 751. In addition, "in order to facilitate appellate review, the district court must explain in detail the reasons behind the imposition of a particular sentence, analogizing to other Guidelines provisions." *Hicks,* 997 F.2d at 599. In this case, although the court gave some explana-

7. In *Roberson,* the Fifth Circuit considered the applicability of § 5K2.8 in light of language in § 5K2.0 that confined courts to taking into account harms "relevant to the offense of conviction." 872 F.2d at 603–04. Under Sentencing Guideline § 1B1.3, "relevant conduct" includes conduct "in the course of attempting to avoid detection or responsibility for th[e] offense." *Id.* at 604. The defendant in *Roberson* had burned and concealed the body of his roommate, whom he had found dead and apparently not killed, and was convicted for using the roommate's credit cards. *Id.* at 600. The court affirmed an upward departure based on the defendant's extreme conduct toward the decedent, reasoning that even if the focus of § 5K2.8 was the harm to the "victim," in that case the bank, the defendant's conduct in burning and concealing the body, and refusing to report the death, was an attempt to "avoid detection." *Id.* at 603–05.

Since *Roberson,* the language in § 5K2.0 concerning the offense of conviction has been eliminated. The sentence containing the limitation was removed because it was "unclear and overly restrictive." U.S.S.G. App. C # 358. Under the Guidelines in effect at the time of Quintero's sentencing, therefore, the district court was at least as free as the *Roberson* court to view the defendant's conduct as falling within § 5K2.8 as extreme behavior performed in the course of attempting to avoid detection.

8. The plain language of the provision bolsters this conclusion. The phrase "to the victim" appears to modify the term "degrading," making the point that the Sentencing Commission was not concerned about conduct that might be degrading to the offender. By contrast, the terms "heinous," "cruel," or "brutal" conduct need no such clarification.

tion for the extent of its departure,[9] its explanation was insufficient to allow adequate review and did not analogize to other Guideline provisions. Consequently, it fails to meet the requirements of *Lira–Barraza* and must be vacated.

## III. CONCLUSION

Based on the foregoing analysis, the conviction of Lopez Quintero for voluntary manslaughter is AFFIRMED. His sentence is VACATED, however, and the case is REMANDED for re-sentencing consistent with this opinion.

---

9. The sentencing range calculated in the Presentence Investigation Report was 70 to 87 months. The court departed upward to 108 months based on the defendant's conduct after A.B.Q.'s death. The court explained that it was not giving the statutory maximum of 120 months because it wanted to give the defendant "at least some of the sympathy and consideration that you [Quintero] should have given your daughter, and that's something for you to think about." This statement explains why the court did not depart *more* than it did, but sheds little light on why the court departed to the extent that it did.

