**Glenda KLEEMAN, Petitioner–Appellant,**

v.

**UNITED STATES PAROLE COMMISSION, Respondent–Appellee.**

No. 96–10360.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 1997.

Decided Sept. 8, 1997.

Geoffrey A. Hansen (argued), Anne W. Lackey and Elizabeth A. McKenna (on the brief), Federal Public Defender's Office, San Francisco, CA, for petitioner-appellant.

Sharon Gervasoni, United States Parole Commission, Chevy Chase, MD, for respondent-appellee.

Before: REINHARDT, T.G. NELSON and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

In this most unusual case, we review a determination of the United States Parole Commission ("the Commission") under a treaty between the United States and the Republic of Mexico that permits citizens of one country convicted of a crime in the other to serve the sentence in the prisoner's home country. In addition to approving the transfer, the receiving country must determine the most analogous offense of conviction and sentence the prisoner accordingly.

Glenda Kleeman ("Kleeman"), a United States citizen, appeals the Commission's decision determining her release date under 18 U.S.C. § 4106A(b)(1)(A) based on a conviction in Mexico for "simple homicide." Kleeman was sentenced to 10 years in prison in Mexico and sought a transfer to serve her sentence in the United States. The Commission set her sentence at 72 months with 48 months of supervised release, based on its finding that Kleeman killed her victim with malice, so that the most analogous crime to her conviction in Mexico was second degree murder rather than voluntary manslaughter. We hold that Kleeman did not act with malice, and we reverse and remand to the Commission to reclassify her offense as voluntary manslaughter.

## I. FACTS

Kleeman, age thirty-three, was sexually abused as an adolescent. Her stepfather raped her when she was eighteen and threatened to have her "taken care of" and to stop supporting her mother if she failed to keep it a secret. Kleeman suffered her first psychotic breakdown at age twenty-one and was hospitalized and diagnosed as suffering from bipolar disorder, manic type. A recent psychological evaluation reveals that Kleeman suffers from a range of problems including impulsivity, immaturity, superficial relationships, hostile dependence, and bipolar disorder. In addition, she has abused alcohol and drugs in the past and continues to smoke marijuana.

Kleeman was charged with and convicted of simple intentional homicide in Baja California, Mexico. She is currently serving her sentence in the United States pursuant to a prisoner transfer treaty between the United States and Mexico.

At her transfer treaty ("transfer") hearing, Kleeman testified to the following circumstances surrounding her arrest and conviction. In December 1994, Kleeman traveled to Baja California, Mexico with a friend, Jerry Jenkins ("Jerry"), and a man named Scott Bendix ("Scott"). Scott was the boyfriend of Jerry's pregnant daughter, and Kleeman had the impression that Jerry disliked Scott.

On their first evening in Mexico, the three of them checked into a motel room together. Several times throughout the evening, Scott indicated that he wanted to have sex with Kleeman, and she declined his advances. The following evening when she again refused, Scott became violent and threatened to rape and kill her. When Scott became increasingly angry, Kleeman and Jerry left the motel. Scott followed them and threatened to kill Jerry, his daughter, and anyone else who tried to stop him. Kleeman and Jerry eventually escaped and spent the night in a motel away from Scott.

The following day, Jerry and Kleeman returned to their original motel to gather their belongings. Jerry proposed to Kleeman that they leave Scott in Mexico "because we can't trust him." They ran into Scott at the motel, however, and he apologized for his behavior. Jerry allowed him to rejoin them, but Kleeman tried to stay away from Scott as much as possible.

That evening, Jerry assured Kleeman that it would be all right for them to share a room with Scott. Later that night, the three of them and a friend of Jerry's drank heavily and smoked marijuana. After his friend left,

Jerry told Scott and Kleeman to gather their guns from the car and bring them up to the room, which they did.[1] Kleeman remembers telling Jerry she felt uncomfortable with the situation and his responding that "something bad" might happen. The three then began to watch television, with Kleeman and Jerry on one bed and Scott on the other.

According to Kleeman's statement to the prosecutor the night of the crime, Jerry told her "the only way to put an end to the situation was to get rid of Scott, that they had to kill him and that Jerry would tell her when to do it." Although she refused his suggestions, Jerry kept up the psychological pressure on Kleeman throughout the evening. At one point, she became very confused and went to the bathroom, taking the gun with her to protect herself. She then "heard something in her imagination," "received images from the television," and Jerry told her "now was the time." Pulling out her gun, she fired four times at the sleeping Scott.

After her transfer to the United States, Kleeman told a United States Probation Officer (who was preparing a post-sentence report for the Commission) that she believed Scott had a gun under his pillow while he was watching television and that he was going to kill her and Jerry. She claimed that Jerry encouraged her to stay awake so they could "keep an eye on" Scott, that Jerry was telling her she needed to protect them, and that she was "getting images from the television" confirming this belief.

In Kleeman's confession to the Baja California police, she stated that after the shooting Jerry started screaming at her and telling her she had done something wrong, that she had misunderstood him, and that he meant to get rid of Scott in a different way. They both went to a nearby hospital to report the shooting and were taken into custody immediately. Kleeman recalls Jerry telling her that she better tell the police he had nothing to do with the shooting. The police released Jerry after 24 hours and Kleeman has not seen or heard from him since.[2]

Jerry's statement to the authorities indicated that on the day of the crime, he and Scott had fallen asleep around midnight and that he had been awakened by the sound of gun shots and saw Kleeman holding a gun. He noted that all three had smoked marijuana earlier and that Kleeman and Scott had not fought that day. He said Kleeman had told him immediately after the shooting that she "had to do it."

Kleeman was placed in the prison's medical clinic under the care of a psychiatrist. While in prison, Kleeman was raped, suffered psychotic episodes, and attempted to insert objects into her vagina, causing herself pain and bleeding.

## II. PROCEDURAL HISTORY

Based on Kleeman's confession, corroborated by testimony that she had fired the gun, the gunpowder residue on her hand, the victim's body, and Jerry's statement, the trial court in Mexico held that she committed simple intentional homicide. The court found that the victim was "obviously asleep" and unarmed when Kleeman shot him, that she and Scott had no arguments that day and she had not been threatened by him, and that she had not acted in self-defense or as a result of a fight. The court concluded that "this shows the defendant lacked any legal motive to take the life of the victim." It further noted that, while Kleeman's prior psychiatric history could have been exculpatory—if she had shown by conclusive evidence that she was "mentally incapacitated in a way such that she couldn't be charged with a crime, or was incompetent"—she had not met her burden of proof for this defense because "neither the defendant or her defense attorney took an active part in the proceedings." Accordingly, the court sentenced her to 10 years in prison. The Court of Appeals of Mexico affirmed the conviction

1. All three were carrying loaded guns.

2. At her hearing, Kleeman reported that she asked one of her friends to get some of her belongings from her apartment in Colorado Springs. There her friend ran into Jerry, who had taken over Kleeman's apartment and truck.

and sentence.[3]

After serving a portion of her sentence in Mexico, Kleeman applied for and was granted a transfer to the United States to complete service of her sentence pursuant to the Treaty on the Execution of Penal Sentences, Nov. 25, 1976, U.S.-Mex., 20 U.S.T. 7399. She was placed at the Federal Correctional Institution in Dublin, California.

The United States Probation Office prepared a post-sentence report ("PSR") in anticipation of the transfer hearing and ordered a psychological evaluation. The psychological evaluation found that Kleeman had been raped while in custody in Mexico and diagnosed her as suffering from bipolar disorder with Post Traumatic Stress Response Syndrome. It also reported that Kleeman's behavior during the time prior to the shooting was "consistent with an acute psychotic state."

The PSR concluded that the most analogous United States offense to the offense of conviction in Mexico was voluntary manslaughter. It stated: "Manslaughter is the unlawful killing of a human being without malice. 18 U.S.C. § 1112(a). Based upon the findings made by the trial court in Mexico, there was not proof of premeditation and insufficient proof of 'malice.'" Accordingly, the PSR listed the applicable guideline range for sentencing as 41 to 51 months.

The United States Parole Commission disagreed, asserting instead that under the Baja Penal Code, Kleeman's conviction in Mexico most closely resembled second degree murder because while the Baja code provides for a voluntary manslaughter-type offense in the form of "homicidio en rina" (for homicide in a *physical* dispute only), Kleeman was found guilty of "homicidio simple."[4] The Commission's Prehearing Review stated:

> Since the shooting did not occur in the heat of an argument, it does not appear to be voluntary manslaughter. However, it does appear that if subject had just been raped, she may have been under extreme emotional duress and the Commission might consider a guided departure to the voluntary manslaughter guideline range.[5]

In calculating Kleeman's base offense level, the Commission further noted that "the underlying facts are that the subject shot the victim four times in the head as he slept and the foreign code provides for a voluntary manslaughter-type offense in the form of 'homicidio en rina' where subject was convicted of 'homicidio [simple].'"

After Kleeman's transfer hearing, Commission examiners found that they agreed as to the following: (1) Kleeman's offense of conviction in Mexico was most analogous to second degree murder; (2) she qualified for a three-level reduction for acceptance of responsibility; (3) her criminal history category was category I; (4) her offense level was 30; (5) special drug and mental health aftercare conditions should be imposed; and (6) a downward departure was warranted based on both the circumstances surrounding the offense itself and the sexual assaults Kleeman suffered while incarcerated in Mexico. The examiners disagreed, however, on the length of Kleeman's sentence: one recommended 60 months and the other 72 months.

In response to the examiners' tentative conclusions, Kleeman urged the Commission to resolve the dispute by finding that her offense more closely resembled voluntary manslaughter, an argument made previously

---

3. The trial court refused to find Kleeman responsible for "aggravated homicide," which the prosecutor originally argued for, because it did not find evidence of premeditation. The court stated: "The reason is there wasn't a period of time of a certain length, between the moment the intent to kill was formed and the moment the crime was committed, nor was there any reason to believe that defendant insistently thought about the commission of the crime."

4. The definitions and explanation of terms in the Baja code are discussed further in the Analysis section.

5. The facts as to whether Scott actually raped Kleeman are, like much of this case, unclear and confused. A letter from one of Kleeman's friends, Kelly Valentine, which is discussed in the PSR, reports a conversation with Kleeman while she was in custody in Mexico. Valentine recalls Kleeman telling her that Scott had raped her on the beach. In her objections to the PSR, however, Kleeman states that she "believes she told Kelly Valentine that [Scott] had attempted to rape her, not that he actually did."

at the hearing. She noted that the criminal laws of the United States categorize degrees of homicide differently than the Baja Penal Code, and that "homicidio en rina" is a much more restrictively defined offense than voluntary manslaughter under the United States Code. Thus, Kleeman argued, when analyzed according to the definition of voluntary manslaughter as understood in the United States, her crime is most similar to voluntary manslaughter, not second degree murder.

The Commission Legal Office review of the transfer determination recommended that the Commission find the offense similar to second degree murder because the killing did not occur in a "heat of passion" caused by adequate provocation that would negate the element of "malice." It stated: "The conduct of Scott Bendix was not adequate provocation, and it evidently required the sinister urgings of Jerry Jenkins to put Kleeman into a sufficiently paranoid state of mind to form the intent to kill [Scott]. There appears to have been 'malice' arising from irrational anger and fear...." The Legal Office did recommend a downward departure, however, stating that "Kleeman's malice toward [Scott] was apparently the result of [Jerry's] manipulating Kleeman's confused thinking under circumstances that clearly produced extreme irrationality."

The Commission's final transfer determination held Kleeman's offense to be most similar to second degree murder and set her sentence at 72 months, with 48 months of supervised release. It stated:

> The release date determination is a departure from the guideline because you were under severe emotional distress at the time of the offense and another individual deliberately encouraged you to form a deluded, irrational intent to kill the victim, making your crime comparable in culpability to voluntary manslaughter even though the element of malice was present in your mind. You were also a victim of sexual assault while in foreign custody. The extent of the departure found appropriate by

the Commission is, however, limited by its concern that you will remain a serious risk for harming others in the future, as evidenced by your long history of serious emotional difficulties, and your voluntary possession of a firearm at the time of the current offense.

## III. STANDARD OF REVIEW

■ Our appellate review of the transfer determination is the functional equivalent of our review of a district court's sentencing decision. 18 U.S.C. § 4106A(b)(2)(A); *Trevino–Casares v. United States Parole Comm'n,* 992 F.2d 1068, 1070 (10th Cir.1993). Thus, we review the Commission's interpretations of law (including foreign law) de novo, *see, e.g., Brady v. Brown,* 51 F.3d 810, 816 (9th Cir.1995), and its factual findings for clear error. *See, e.g., United States v. Buenrostro–Torres,* 24 F.3d 1173, 1174 (9th Cir.1994).

■ The Commission's determination of the most similar United States offense required it to compare the Baja Penal Code to the United States criminal code and to decide what offense of conviction should be assigned, given the facts. At the very least, this determination involves questions of both law and fact, and hence we review it de novo. *See, e.g., Boone v. United States,* 944 F.2d 1489, 1492 (9th Cir.1991).[6]

## IV. ANALYSIS

### A. *Relevant Statutes and Regulations*

■ In transfer cases, the Commission "is charged with the task of translating a foreign sentence into terms appropriate to domestic penal enforcement." *Trevino–Casares,* 992 F.2d at 1069. Specifically, the Commission must apply the federal sentencing guidelines to the investigative reports and recommendations of the United States Probation Service to determine a combined term of imprisonment and supervised release for the transferred offender "as though the offender were convicted in the United States district court

---

**6.** We do not agree with the government's position that, because the central issue is whether Kleeman acted with malice, the question of whether her offense is most similar to second degree murder should be reviewed for clear error. This case did not involve a factual dispute, but rather a question of what constitutes malice, a legal question that we review de novo.

of a similar offense." 18 U.S.C. § 4106A(b)(1)(A). Regulations provide:

> The Commission shall take into account the offense definition under foreign law, the length of the sentence permitted by that law, and the underlying circumstances of the offense behavior, to establish a guideline range that fairly reflects the seriousness of the offense behavior committed in the foreign country.

28 C.F.R. § 2.62(g).

## B. Homicide Under the Baja Penal Code

The definition of homicide is contained in Article 123, which states simply, "Whomever deprives another of his life commits the crime of homicide." Article 124 establishes the punishment for "Simple Homicide" (Homicidio Simple), which is 8 to 15 years imprisonment. Article 125 punishes "Homicide in an Affray" (Homicidio en Rina) with 4 to 10 years imprisonment. Article 146 defines an "affray" as follows: "For all criminal law purposes, an affray is understood to mean a physical, not verbal, dispute between two or more persons, with the purpose of causing one another mutual harm." Finally, Article 126 punishes "Willful Homicide" (Homicidio Calificado) with 16 to 30 years imprisonment. Article 147 defines "willful homicide" as follows: "It is understood that assault and homicide are willful, when they are committed with premeditation, with superior advantage, with malice or treachery."[7]

## C. Homicide Under the United States Code

■ The crucial distinction between second degree murder and voluntary manslaughter under United States law is the presence or absence of malice. *United States v. Quintero*, 21 F.3d 885, 889 (9th Cir.1994). If malice is present, then the crime is second degree murder at minimum; if malice is absent, the crime is voluntary manslaughter, a lesser-included offense of murder.[8] *Id.*

■ To establish malice or malice aforethought in a homicide prosecution, the government must prove that the defendant killed "intentionally or recklessly with extreme disregard for human life." *United States v. Paul*, 37 F.3d 496, 499 (9th Cir. 1994). "[D]isregard for human life becomes more callous, wanton or reckless, and more probative of malice aforethought, as it approaches a mental state comparable to deliberation and intent." *United States v. Lesina*, 833 F.2d 156, 159 (9th Cir.1987).

■ If a defendant kills with the mental state required for murder, but does so in the "heat of passion" caused by adequate provocation, then the defendant is guilty of voluntary manslaughter. *Paul*, 37 F.3d at 499. A finding of "heat of passion" and adequate provocation negates the presence of malice. *Id.* Neither of these circumstances need be present, however, to reduce murder to manslaughter; rather, they constitute "evidence [that] acts in the nature of a defense to the murder charge." *Quintero*, 21 F.3d at 890. "Intent without malice, not the heat of passion, is the defining characteristic of voluntary manslaughter." *Id.* As such, the defendant does not bear the burden of proving the absence of malice; the government must prove the presence of malice beyond a reasonable doubt. *See, e.g., Lesina*, 833 F.2d at 160.

## D. The Most Similar United States Offense

■ Kleeman contends that the circumstances surrounding the shooting of Scott do not show that she acted with malice, but

---

**7.** Both parties agree, and a comparison of the codes reveals, that the term "malice" has a different meaning under the Baja Penal Code, and hence any discussion by the Mexican courts of malice is not dispositive of whether Kleeman acted with the requisite malice to classify her crime as second degree murder in the United States.

**8.** The United States Code defines voluntary manslaughter as follows:

Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
 Voluntary—Upon a sudden quarrel or heat of passion.

18 U.S.C. § 1112(a).

 Murder is defined at 18 U.S.C. § 1111(a). This section sets forth the requirements for first-degree murder and states that "[a]ny other murder is murder in the second degree."

rather with an actual but unreasonable belief of imminent danger—i.e., an imperfect self-defense claim. She claims that because the Baja Penal Code's definition of voluntary manslaughter is more restrictive than the United States' definition, the issue is what crime she would have been guilty of in the United States. To put her point differently, she contends, and we agree, that the crime of "homicidio simple" of which Kleeman was convicted in Mexico covers certain types of conduct that would be classified as voluntary manslaughter under our law. One convicted of "homicidio simple" may have committed an act that we would treat as murder in the second degree or only as voluntary manslaughter. Because we agree, as a matter of law, that the facts do not establish Kleeman acted with malice, we conclude that the comparable United States offense is voluntary manslaughter. Thus, we do not reach the imperfect self-defense issue.[9]

The Commission's factual findings, which are not disputed, do not support its conclusion that Kleeman acted with the requisite malice for second degree murder. Malice cannot exist when, as the Commission found, Kleeman was in an extremely irrational and paranoid state of mind brought about by the external manipulation of her already confused thinking. The evidence does not establish beyond a reasonable doubt that Kleeman formed, or could have formed, the intent to kill Scott necessary to establish malice, and the Commission's findings do not support that conclusion. In fact, many circumstances suggest otherwise: her drug use, her history of sexual abuse and psychiatric problems coupled with Scott's threats and sexual advances, her delusional state evidenced by her receipt of images from the television, and Jerry's "sinister urgings" leading to a deluded irrational intent or passionate state of mind at the moment of the offense.

The Commission itself acknowledged that these circumstances made Kleeman's crime "comparable in culpability to voluntary

manslaughter," but nonetheless held that she acted with malice. The Legal Office's recommendation stated that "[t]here appears to have been 'malice' arising from irrational anger and fear," but noted that this malice "was apparently the result of [Jerry's] manipulating Kleeman's confused thinking under circumstances that clearly produced extreme irrationality." These statements indicate that the Commission's understanding and definition of malice, as a matter of law, was erroneous. Therefore, we reverse and remand to the Commission to reclassify Kleeman's offense as voluntary manslaughter and to determine her term of imprisonment and supervised release accordingly.

REVERSED AND REMANDED.

---

**9.** To the extent the Commission relied solely on the Baja Penal Code's definition of voluntary manslaughter to hold that Kleeman could not assert that defense in the United States, it was incorrect. Given the differences between the Baja Penal Code and the United States Code with respect to voluntary manslaughter, the Commission was required to evaluate the underlying circumstances of the offense behavior, not simply the offense definition under foreign law. *See* 28 C.F.R. § 2.62(g).