**UNITED STATES of America, Appellee,**

v.

**Ronald Wendell DOWNS, Sr., Appellant.**

94–3404.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1995.

Decided June 13, 1995.

John L. Lane, Cedar Rapids, IA, argued, for appellant.

Robert L. Teig, Asst. U.S. Atty., Cedar Rapids, IA, argued, for appellee.

Before MAGILL, Circuit Judge; HEANEY, Senior Circuit Judge; and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HEANEY, Senior Circuit Judge.

On July 1, 1994, defendant, Ronald Wendell Downs, Sr., was found guilty of murder in the first degree for the killing of Gloria Heising.[1] In this direct appeal of his conviction, Downs contends that the evidence was not sufficient to establish the elements of murder in the first degree. We affirm Downs's conviction.

## I. Standard of Review

In reviewing the sufficiency of the evidence presented to the district court below, our standard is whether, viewing the evidence in the light most favorable to the government, the court's verdict is supported by substantial evidence. *United States v. Karunatileka*, 820 F.2d 961, 965 (8th Cir.1987). This court employs a "very strict" standard of review for claims of insufficient evidence. *United States v. Burks*, 934 F.2d 148, 151 (8th Cir.1991). "An appellate court must reject an assertion that there was insufficient evidence to convict if, when the evidence is viewed in the light most favorable to the government, it finds that the trier of fact could reasonably have inferred guilt beyond a reasonable doubt." *United States v. Young*, 702 F.2d 133, 137 (8th Cir.1983).

## II. Elements of First–Degree Murder

The federal murder statute imports from the common law a distinction between first- and second-degree murder. 18 U.S.C. § 1111(a). A murder, defined as "the unlawful killing of a human being with malice aforethought," becomes murder in the first degree when the killing was "perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing...." *Id.* Downs does not contend here that the government failed to prove beyond a reasonable doubt the elements of second-degree murder, that is, that he unlawfully killed Gloria Heising with malice aforethought. Our sole task on this appeal is to determine whether the district court's findings of premeditation and lying in wait were

---

1. Downs was charged pursuant to 18 U.S.C. § 1114, which makes it a federal crime to kill "any officer of employee of the Postal Service ... engaged in ... the performance of his official duties...." Downs's simultaneous convictions on firearms charges pursuant to 26 U.S.C. §§ 5841, 5861(d), and 5871 are not challenged in this appeal.

supported by substantial evidence. This court has previously cited with approval the premeditation formulation of Professors La-Fave and Scott, which advises us to focus our inquiry on three nonexclusive categories of evidence:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;* (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*United States v. Blue Thunder,* 604 F.2d 550, 553 (8th Cir.1979) (quoting W. LaFave & A. Scott, Jr., *Criminal Law* § 73 at 564 (1972)) (emphasis in original). Accordingly, we structure our review of the record along those lines.

### A. Evidence of Planning Activity

■ The evidence presented at trial showed that Downs selected the day of the killing with considerable care. At the time of the killing, his son and daughter-in-law owned a house on Heising's daily mail route. Without their knowledge, Downs made a copy of the key to their house at some point prior to the killing. By his own admission, Downs decided to use his son's house to engineer some kind of encounter with Heising, in violation of the terms of his probation. Though Downs claimed at trial that he intended the encounter to be no more than a peaceable farewell, the evidence suggests otherwise.

Downs selected January 14, 1994, a day when, by virtue of their work schedules, he was certain that his son and daughter-in-law would not be present in their home at the time Heising made her rounds. On January 13, Downs performed at least four preparatory acts. First, Downs rented a minivan with tinted windows, emphasizing to the rental agency clerk the importance of the tinted windows. Later that day, Downs removed the rear seats, disabled the interior dome lights, and taped sheets of black plastic over the inside of the minivan's windows. Second, Downs hid himself along Heising's mail route to verify that a substitute was performing her duties. As a former co-worker of Heising's at the U.S. Postal Service, Downs knew that the presence of the substitute virtually guaranteed that Heising would be back on her route the next day. Third, Downs prepared and mailed four letters to his son's address. Three of the letters were sent first class, two of them addressed in disguised handwriting. The fourth letter, typewritten with a false return address, was sent certified mail, thus ensuring that Heising would knock on his son's door to secure the required signature. Fourth, Downs and a close friend, Margaret Bails, cleared the accumulated snow from his son's ordinarily unused driveway, something Downs had never before done.

On the morning of the murder, Downs arose early and departed from Bails's house by 6:00 a.m. The record shows that Downs had in his possession at that time a .410 single-shot sawed-off shotgun, shotgun shells, a .44 five-shot handgun, a quantity of hollow-point ammunition, a sharpened knife, two blankets, two lengths of rope with loops at the ends, and duct tape. After waiting in the minivan at a park for approximately two hours, he telephoned his son and daughter-in-law's house to confirm that both had left for work. By 8:45, Downs had arrived at the house, hid the minivan in the garage, and entered the premises with the copied key.

Once inside, Downs covered both sides of the outside screen door with black plastic sheets. Downs loaded the shotgun and placed two extra shells in his pocket. He loaded the handgun with hollow-point bullets and stuck the gun in his belt. Just inside the entry door, Downs waited for Heising with the loaded guns, a large metal club, a length of rope and a roll of duct tape.

The evidence of planning thus firmly supports the district court's finding of premeditation.

## B. Nature of the Killing

Shortly after 1:30 p.m. on January 14, 1994, Gloria Heising parked her Postal Service Jeep in front of the house. She began her mail route across the street. When Heising finally approached the door behind which Downs hid, Downs kicked open the door, chased Heising into the driveway and shot her in the hip with the sawed-off shotgun. According to eyewitness accounts, as Heising crawled on her back into the street, Downs reloaded and fired off a second shot, missing Heising. Downs dropped the shotgun, then picked it up and again reloaded. Standing over Heising as she pled for her life, Downs prodded her with the shotgun, then fired a bullet into her head just above the right eye. Downs then walked back up the driveway to retrieve from the snow the .44 handgun, which had fallen from his belt during the chase. Calmly, Downs returned to Heising and shot her three times around the heart and once between the eyes. At trial, expert testimony suggested that Heising's heart and lungs were still functioning after the first shotgun bullet to the head and before the handgun shots into her heart.

When police arrived, Downs surrendered and confessed to the killing. Police investigators later found the guns hidden in the basement of Downs's son's house under the floorboards of a shower.

The nature of the killing thus provides strong evidence of premeditation. Even if we believed (which we do not) that Downs had initially assaulted Heising in the heat of passion—that is, that he had not formed the necessary premeditative intent to kill Heising prior to her arrival at the son's house—Downs's actions between the first bullet and the last convince us that the killing was sufficiently "willful, deliberate, malicious, and premeditated" to constitute first-degree murder.

## C. Evidence of Motive

Over the preceding several years, Downs and Heising had been involved in a relationship marked by tumult, by alternating periods of separation and reconciliation, and by threats, intimidation, and physical abuse by Downs. Whenever Heising attempted to terminate the relationship, Downs launched a cruel campaign of harassment and intimidation. The record contains considerable evidence as to the timing and nature of the abuse, and we need not recount it in detail here. We note in summary that on various occasions Downs struck Heising, fired bullets toward her, and threatened her with a knife. The abuse may well have been cyclical, but it was a recurrent feature of the relationship. The evidence further shows that Downs sought to exercise complete control over Heising. For example, Downs forbade Heising to go to the grocery store unless accompanied by him. He likewise ordered that Heising's children eat meals at a different table, and that Heising was not to spend time with her children after dinner.

At the onset of their involvement with each other, Downs and Heising were both employees of the U.S. Postal Service in Cedar Rapids. In November 1991, Heising recorded several telephonic threats made by Downs against her, leading to state harassment charges and the imposition of a no-contact order. At around the same time, Downs's threats and assaults on Heising, some of which had been committed on Post Office grounds, eventually led to his firing in December 1991, thus ending a 25–year career there. The state court charges were resolved in March 1992 when Downs pled guilty in the Linn County District Court to one count of harassment and was given a one-year suspended sentence with two years of probation.

Despite these events, Heising and Downs resumed their relationship in the weeks following Downs's sentencing in the spring of 1992. Though we will never know with certainty what forces motivated Heising to return to Downs, it is clear that the continuation of the relationship exacted a terrible toll on her. In July 1993, Heising attempted suicide and admitted herself for psychiatric care. Upon her release from the hospital, she spent a month in a shelter for battered women. In addition, she obtained a new no-contact order against Downs effective July 29, 1993. The summer of 1993 constituted a decisive break in Heising's attitude toward

Downs: she determined to sever the relationship permanently.

There is substantial evidence in the record that Downs had, over the course of several years, warned Heising of his "three-step plan" whenever she indicated a desire to terminate their involvement. First, he would quit his job. Second, he would sell his house. Third, he would kill Heising. Downs told Heising of the plan verbally, and made reference to it in postcards sent in 1991. Allusions to the plan figured prominently in Downs's threats against Heising.

Viewing the record as a whole, it is clear that Downs was motivated by a desire to exact revenge on Heising. His actions in the months leading up to the killing were consistent with such a motive as well as with his "three-step plan" articulated in earlier threats. Having been fired from his job, Downs took steps to dispose of all of his assets, including his house and its contents. In December 1993, Downs transferred $2,000 to each of his children. At the same time the proceeds from the sale of his house, totalling some $69,000, were transferred to Downs's close friend, Margaret Bails. Thus, having completed the first two steps of his plan, Downs prepared to carry out the third.

We find that the evidence of motive clearly supports the district court's finding of premeditation.

*III. Downs's Contentions*

On appeal, Downs argues that his history of violence toward Heising prevents the district court from deducing premeditation from the fact that he brought firearms to his son's house on the morning of the killing. Essentially, Downs argues that because he made violent threats against Heising with guns in the past, the district court can only infer from the evidence an intention to make further violent threats. We reject this contention as meritless. Among other things, such a rule would shield all habitual batterers and abusers from prosecution for first-degree murder. However common, repeated acts of domestic violence cannot inoculate a defendant against the inference that the careful preparation of firearms signaled an intent to commit murder.

Downs also contends that his payments to Margaret Bails just before the killing do not support a finding of premeditation because they represented a return of loans and of money entrusted by Bails to Downs for investment purposes. Even if true, this fact in no way obviates the relevance of the *timing* of the payments to the premeditation inquiry. Regardless of the purposes for which he distributed the funds, the fact that Downs liquidated all his assets just prior to the killing clearly supports the district court's finding of premeditation.

*IV. Conclusion*

We find that the evidence set forth in the record and outlined above constitutes a fully sufficient basis on which to convict Ronald Downs of first-degree murder for the killing of Gloria Heising. Specifically, the record clearly supports both of the two independently sufficient grounds for first-degree murder found by the district court to exist in this case: first, that Downs had been "lying in wait"; and second, that the killing was "willful, deliberate, malicious, and premeditated." 18 U.S.C. § 1111(a). Accordingly, the conviction below is affirmed.