**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

KENDERICK BEGAY, a.k.a. Kendrick
Begay,
            *Defendant-Appellant.*

No. 07-10487

D.C. No.
CR-06-00626-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
January 14, 2009—San Francisco, California

Filed June 1, 2009

Before: Myron H. Bright,* Procter Hug, Jr., and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Reinhardt;
Concurrence by Judge Bright

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

6487

**COUNSEL**

Daniel L. Kaplan, Assistant Federal Public Defender, Phoenix, Arizona, for the defendant-appellant.

Ann Birmingham Scheel, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

**OPINION**

REINHARDT, Circuit Judge:

Defendant-appellant Kenderick Begay appeals his convictions of two first-degree murders in violation of 18 U.S.C. §§ 1153, 1111 and of two counts of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Begay's principal argument on appeal is that the evidence introduced at trial, when taken in the light most favorable to the government, fails to establish that he committed a "premeditated killing." 18 U.S.C. § 1111. Because we agree that the government failed to introduce evidence sufficient to show premeditation — an essential element of first-degree murder — we reverse the denial of his motion for judgment of acquittal on counts one and two and thus his first-degree murder convictions. We affirm, however, his two convictions for using a firearm during a crime of violence and his sentence of thirty-five years' imprisonment on those two counts.

## I.   BACKGROUND

In the early morning hours of March 28, 2002, Kenderick Begay[1] drove his truck through the Navajo Indian Reservation

---

[1]The record reflects that "Begay" is a common surname in the Navajo Nation and does not always reflect a familial relation between two individuals bearing that name. In this case, four relevant parties bear the surname Begay: the defendant, his sister Mecheryl, a man named Emmanley, and a man named Larry. The latter two bear no familial relation to the first two or to each other. We refer to the defendant by his surname and to the other Begays by either their first or full names.

in Greasewood, Arizona after leaving a gathering at the "windmill," an area in town where the youth partied. His passengers included his sister Mecheryl Begay, Loren Clark, Emmanley Begay, and Jessica Lee. When a car passed them traveling in the opposite direction sometime around 2:00 a.m. or 3:00 a.m., Begay turned his truck around. The other car turned around as well. When the two vehicles passed each other again, Begay flashed the lights of his truck, presumably signaling the other car to stop. The two vehicles pulled off the highway and onto a dirt road. Begay got out of his truck and walked to the driver's side of the other car. Two high school students, J.T. and O.C.,[2] were in the car; O.C. was in the driver's seat and J.T. was in the front passenger's seat.

After about a minute of standing by the driver's side of the car, probably exchanging words with the car's occupants, Begay walked back to his truck. He reached under the driver's seat, pulled out a .30 caliber rifle, and walked back to the passenger's side of the car. Begay shot eight or nine times through the passenger-side front window, shattering the glass. Six of the bullets hit J.T., while some of the shots missed, hitting the driver's side door. One of the bullets that struck J.T. passed through him and hit O.C.

After firing the shots, Begay walked back to his truck and put the gun under the back seat. Clark, who had gotten out of the truck prior to the shooting to relieve himself, "just stood there" before asking, "What the hell are you doing?" Begay did not answer. His sister Mecheryl ran up to him making "horrible cries" and yelling at him, screaming, "What did you do?" or "Why did you do that?" Begay told her to be quiet. Clark walked over to the car and saw J.T. gasping for air and O.C. sitting in her seat. Clark again asked Begay why he shot the victims, but Begay did not respond.

---

[2]Because the victims were minors, we refer to them using only their initials. *See* 18 U.S.C. § 3509(d).

Begay, Mecheryl, and Clark got back into the truck and drove away. Lee remained behind. Up until the shooting, she was in a comatose state in the rear of the truck as a result of having consumed too much alcohol. The gunshots roused her from her stupor, at which point she felt an immediate need to vomit and exited the truck to do so. Lee did not reenter the vehicle following the shooting, but instead walked home from the crime scene. As she passed O.C.'s car, she saw O.C. trying to hold J.T. upright and saw that J.T.'s shirt was bloody.

O.C. managed to drive her car to a nearby housing area, where she sought help from Rosita Clark, Loren Clark's mother. By the time O.C. and J.T. arrived, J.T. was already dead. O.C. was transported to a nearby hospital before being transferred to a hospital in Albuquerque, New Mexico, where she died from her wounds three days later.

FBI agents and Navajo investigators began to investigate the crime immediately. They interviewed numerous people, including Begay, who denied being out the night of the murders and stated that he had been with his girlfriend the entire time. Investigators learned from other sources, however, that Begay might have been at the party the victims attended. Approximately two weeks after the murders, investigators located the crime scene, where they found glass on the ground and six .30 caliber shell casings. After this discovery, the agents continued to investigate for several months, but failed to make any further progress.

The investigation's first break came six months after the shooting, in the autumn of 2002, when Jessica Lee contacted the FBI about the murders. She eventually told the FBI, and later testified at trial, that she had been present at the party and left with Begay, Mecheryl, Clark, and Emmanley. Lee admitted that alcohol impaired her memory, but stated that she remembered leaving the party with that group, that, after having passed out, she woke up at the sound of gunshots and that she saw the victims after they had been shot. She also tes-

tified that a few days after the murders, she asked Begay what she should tell the police and that he told her to blame the murders on two other men. Lee and Begay never spoke about the murders again.

The next major development in the investigation came four years after the shooting, in May 2006, when the FBI contacted Clark. Other than Lee, Clark was the only percipient witness who testified at trial. Moreover, as Lee witnessed only the shooting's *aftermath*, Clark was the sole witness to testify as to the events leading up to the shooting or the details of the shooting itself. Clark testified that when the two cars pulled over, he exited Begay's vehicle in order to urinate. Because he was standing at the rear of Begay's truck while Begay was standing alongside the victim's car, he could only see Begay "[f]rom quite a distance." In fact, Clark described Begay as appearing as simply "a black figure" in the night. Clark testified that he saw Begay stand by the car for "just a minute or so" and then come "walking back . . . to his truck." Clark could not see what Begay retrieved from the truck, but saw that he "reached under the driver's side . . . seat," retrieved something, and then returned to the victim's car. At that point, according to Clark, he saw Begay lift the object that he had retrieved from the truck "up on his shoulder and just s[aw] — just s[aw] sparks." Along with the sparks, Clark heard gunshots, which he recognized as coming from a rifle that Begay had used on previous occasions when he and Clark had gone shooting together. When the gunfire ceased, Clark asked Begay why he had shot the victims, but received no response. Rather, Begay told him to get back into the truck, which he did. Begay dropped Clark off at his house immediately following the murders and told him to keep quiet. The next morning, Begay told Clark to say nothing to the FBI and "to watch himself." At various times following the murders, Begay told Clark to "watch his back."

A jury convicted Begay of two counts of first-degree murder and two counts of using a firearm during a crime of vio-

lence. The district court imposed mandatory concurrent life sentences for each murder conviction as well as consecutive 120-month and 300-month sentences, or a total of thirty-five years, for the firearm convictions.

## II.    PREMEDITATION

**[1]** Begay's principal argument on appeal from the first-degree murder convictions is that the government failed to produce sufficient evidence that the murders constituted "premeditated killing[s]." 18 U.S.C. § 1111(a). We review sufficiency-of-the-evidence claims *de novo*. *United States v. Duran*, 189 F.3d 1071, 1078 (9th Cir. 1999). A conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). However, "mere suspicion or speculation cannot be the basis for" a jury's conclusion that an essential element has been satisfied. *United States v. Free*, 841 F.2d 321, 325 (9th Cir. 1988); *see also United States v. Andrews*, 75 F.3d 552, 556 (9th Cir. 1996).

**[2]** The government agrees with Begay that the central issue in this case is whether it produced sufficient evidence that the murders of O.C. and J.T. were premeditated. Premeditation is the essential element that distinguishes first-degree from second-degree murder.[3] 18 U.S.C. § 1111(a), *United States v. Quintero,* 21 F.3d 885, 890 n.3 (9th Cir. 1994). Both

---

[3]Begay was charged under the federal murder statute pursuant to the Indian Major Crimes Act, 18 U.S.C. § 1153, which extends federal criminal jurisdiction to cover specific crimes, including murder, committed by Indians in Indian Country. Premeditation is not required for all forms of first-degree murder under the federal murder statute, as § 1111(a) also defines as first-degree murder certain forms of felony murder that do not require premeditation as an element. It is undisputed, however, that premeditation is a required element of first-degree murder as charged in this case.

courts and commentators have noted the lack of clarity in the precise legal definition of premeditation. *See United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983); 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 14.7(a) at 477 (2d. ed. 2003) ("It is not easy to give a meaningful definition of the word[ ] 'premeditate' . . . as . . . used in connection with first degree murder."); BENJAMIN N. CARDOZO, *What Medicine Can Do For Law*, *in* LAW AND LITERATURE 97-100 (1931) ("[The phrase] deliberate and premeditated . . . . is so obscure that no jury hearing it for the first time can fairly be expected to assimilate and understand it," and "is much too vague to be continued in our law."). Federal courts, however, have "look-[ed] to the common law to find the definition" of the statutory terms contained in the federal murder statute, *United States v. Pearson*, 203 F.3d 1243, 1271 (10th Cir. 2000), and in so doing have concluded, consistent with many state courts, that the element of premeditation essentially requires a showing that the defendant acted with "a 'cool mind' that is capable of reflection, and . . . did, in fact, reflect, at least for a short period of time before his act of killing." *Shaw*, 701 F.2d at 393; *see* LAFAVE § 14.7(a) at 477-78; *see also Austin v. United States*, 382 F.2d 129, 137 (D.C. Cir. 1967) (premeditation requires that "there was a further thought, and a turning over in the mind — and not a mere persistence of the initial impulse"), *overruled on other grounds by United States v. Foster*, 783 F.2d 1082, 1085 (D.C. Cir. 1986). In short, premeditation, at minimum, requires that at some point *after* the defendant forms the intent to kill the victim, he has the time to reflect on the decision to commit murder, that he in fact does reflect on that decision, and that he commits the murder with a "cool-mind" after having engaged in such reflection.[4] *Cf.* 9th Cir. Model Crim. Jury Instr. 8.89 (2003).

---

[4]The distinction between "premeditation" and "deliberation" in the federal murder statute is now largely academic. The statute's full definition of first-degree murder is as follows: a "willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111(a). "[T]he word 'wilful' in the criminal context [refers to] a specific[, as opposed to a general,] intent to do an act forbidden by law," *United States v. Drew*, 722 F.2d 551, 553 (9th Cir. 1983), and the word "malicious" refers to the element of "malice

**[3]** Because premeditation necessarily describes a subjective state of mind about which the defendant rarely provides any direct testimony or evidence, it is almost always an element that must be proved by reference to "the defendant's conduct . . . in the light of the surrounding circumstances." LAFAVE § 14.7(a) at 480; *see also Free*, 841 F.2d at 325 ("Premeditation may . . . be established circumstantially."). In general, the element is typically established through proof that falls into at least one of "[t]hree categories of evidence":

---

aforethought" common to both first-degree and second-degree murder, 18 U.S.C. § 1111(a). Neither specific intent nor malice aforethought is at issue in this case.

This leaves the elements of deliberation and premeditation. Some state courts have required the two terms to be treated as clearly independent elements. *See, e.g., Byford v. State*, 994 P.2d 700, 712-15 (Nev. 2000); *see also Polk v. Sandoval*, 503 F.3d 903, 910 (9th Cir. 2007). Federal courts, however, have generally applied the phrase "deliberate and premeditated" or "deliberate premeditation" to refer to an integrated concept that is essentially synonymous with the term "premeditation" as we have defined it here. *E.g., Shaw*, 701 F.2d at 392-93 (describing "deliberation and premeditation" as one "element"); *Free*, 841 F.2d at 325 (listing only "premeditation" and not "deliberation" as a necessary element of first-degree murder); *Quintero*, 21 F.3d at 890 n.3 (same); *see also Allen v. United States*, 164 U.S. 492, 495 (1896); *Austin*, 382 F.2d at 138-40. Some courts have striven to give each element independent meaning by referring to "deliberation" as the opportunity to reflect and "premeditation" as actual reflection. *See Shaw*, 701 F.2d at 393 (quoting LAFAVE § 14.7(a) at 477-78). This somewhat artificial distinction appears to arise more from a desire to give each statutory term its own meaning than from any actual or inherent distinction between the two words. *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001). In practice, however, such a theoretical distinction is of little consequence. The definition of "premeditation" we provide in the text emphasizes both the opportunity to reflect and the requirement that the defendant in fact engage in such cool-minded reflection. For purposes of this opinion, therefore, we see no need to parse the definition further by attaching certain aspects of it to the concept of "deliberation" and others to the concept of "premeditation." Thus, we use the term "premeditation" herein as a general shorthand for the phrase "deliberate and premeditated."

(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in . . . *planning activity*; (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed [the victim] according to a preconceived design.

LaFave § 14.7(a) at 480; *see also Free*, 841 F.2d at 325 ("Relevant circumstantial evidence includes, *inter alia*, the defendant's prior relationship to the victim, the defendant's carrying of the murder weapon to the scene, and the manner of the killing."). We do not suggest that these three methods of proving premeditation constitute a rigid or exclusive list. Rather, we simply observe that evidence of planning activity, motive, or the cool or methodical nature of the killing is evidence that will tend to support a finding of premeditation, although motive standing alone is the least probative of the three.

**[4]** In Begay's case, there is no evidence sufficiently supporting any of these factors, nor is there any evidence that, viewed in context, otherwise supports the inference that the murders were premeditated killings. As an initial matter, we emphasize that, as the government expressly concedes, there is no evidence of any motive in this case, nor is there any evidence that Begay had a prior relationship with the victims. The United States explicitly stated at oral argument that "the government doesn't know what that reason [for the crimes] is and that's why no motive was presented at trial." Indeed, the record contains no hint of information from which any person could determine why these murders occurred; any purported motive for the crimes would be based on "mere speculation." *Andrews*, 75 F.3d at 556. Curiously, the government claimed at oral argument that the "lack of motive supports [its] pre-

meditation theory: because there was no motive it appears that there was a cold-blooded killing." This argument, however, is completely backward: "Motive directly impacts the question of premeditation and the defendant's state of mind," *House v. Bell*, 311 F.3d 767, 775 (6th Cir. 2002), *rev'd on other grounds*, 547 U.S. 518 (2006), such that "evidence of motive clearly *supports* [a] finding of premeditation," *United States v. Downs*, 56 F.3d 973, 977 (8th Cir. 1995) (emphasis added). *See also Hemphill v. United States*, 402 F.2d 187, 191 (D.C. Cir. 1968) (invalidating first-degree murder conviction where "[t]he attack was without warning or apparent reason"). Similarly, the government acknowledged that "there was no evidence of any prior connection between the defendant and the victims," but again claimed that this supported a finding of premeditation because evidence of "past history lends itself [more] to voluntary manslaughter" than first-degree murder. This argument too is completely backward: This court has directly held that "the defendant's prior relationship to the victim" is evidence that "*support[s]* [a] guilty verdict on [a] first degree murder charge." *Free*, 841 F.2d at 325 (emphasis added). In short, while evidence of motive or a prior relationship between the defendant and the victim may not be *necessary* to show premeditation, the *lack* of such evidence certainly does not *support* a finding that premeditation exists as the government contends.

**[5]** Turning to the other two forms of evidence that typically support a finding of premeditation — planning activity and the cool or methodical nature of the killing — the record does not contain sufficient evidence with respect to either. As to planning activity, the only evidence that could possibly be said to support an inference that the murders here were planned is the fact that Begay had a gun in his truck. However, Loren Clark, the government's only witness to the actual shooting,[5] testified that he recognized the specific gunshots

---

[5]The government attempts to characterize the testimony of Jessica Lee as evidence that "corroborated the eyewitness testimony" provided by

being fired "[b]ecause [he] used to go shooting with [the defendant] and [they] shot this [particular] rifle a couple of times [before]." The mere fact that an individual has in his possession a weapon does not support premeditation if the weapon is one that he routinely uses for lawful, nonviolent purposes. As the District of Columbia Circuit has held: "That [the defendant] used a knife to accomplish the murder is not probative of premeditation and deliberation because he did not procure it specifically for that purpose but rather carried it about with him as a matter of course." *Austin*, 382 F.2d at 139. The same is true here: that Begay had in his truck a gun that the record reflects he regularly used for recreation cannot, without more, support premeditation. There is no other evidence in the record suggesting that Begay engaged in any "planning activity" prior to the murder.[6]

[6] Nor does the record contain any evidence that the manner of the killing was cool and methodical. To the contrary, the record reflects that, despite his practice and experience with the weapon used during the shooting, and despite the fact

---

Clark. However, there is no dispute that Lee was completely unconscious until she was awakened *by the gunshots.* Thus, Lee could not provide any evidence that had any bearing on Begay's state of mind leading up to or during the shooting. *See* LaFave § 14.7(a) at 481-82 ("Conduct by the defendant *after* the killing . . . is obviously not relevant for purposes of showing premeditation and deliberation, as it only goes to show the defendant's state of mind at the time and not before or during the killing." (citing *Austin*, 382 F.2d 129)).

[6]The government also argues that the record contains evidence of planning activity because Begay and his companions drove around for some time after the party instead of going directly home. The contention that this somehow demonstrates premeditation, however, is purely speculative and of no probative force. There is absolutely nothing in the record to suggest that Begay was driving about *in search of his victims*, as opposed to in search of another party, something to eat, or simply to enjoy the night air. Moreover, when Begay first approached O.C. and J.T. in their vehicle, he did *not* carry with him the gun that was in his truck. That he left the weapon behind suggests that he did *not* plan to kill his victims at the time he first walked over to their car.

that he was only three to four feet away from the victim when firing, Begay *missed* a number of times. This suggests agitation, excitement, or frenzy, not the "cool mind" of premeditation. Moreover, given the lack of any evidence shedding light on the circumstances giving rise to the shooting, the sheer number of shots is just as likely to cut against a finding of premeditation as it is to cut in favor of such a finding. "The violence and multiple wounds, while more than ample to show an intent to kill, cannot standing alone support an inference of a calmly calculated plan to kill requisite for premeditation and deliberation," as contrasted with an outburst of rage or a crime otherwise committed in the heat of passion. *Austin*, 382 F.2d at 139; *see also* LaFave § 14.7(a) at 481. We further note that Clark testified that Begay was "pretty drunk" at the time of the shooting. This fact alone strongly suggests an absence of premeditation. *See In re Ellis*, 356 F.3d 1198, 1219 (9th Cir. 2004) (en banc) (noting distinction between "whether defendant committed the murder with deliberation and premeditation, [or] as a result of an impulse[,] or because of alcohol- or drug-induced diminished capacity"); *Kane v. United States*, 399 F.2d 730, 736 (9th Cir. 1968) (observing that intoxication can be "exculpatory" in a first-degree murder prosecution). At best, any determination as to premeditation would necessarily be speculative in nature.

In short, the government produced no evidence supporting premeditation in this case. The dearth of evidence with respect to that element is illustrated by the nature of the government's arguments in favor of premeditation made to us and, more important, to the jury. In its opening brief on appeal, the government seeks to mislead the court, asserting falsely that the record contains sufficient evidence of premeditation because Clark testified that he "watched as [the] defendant *calmly* returned to his truck" to retrieve the gun, "*methodically* retrieved the rifle," "*methodically* held the gun up to his shoulder," fired nine shots, and then "*calmly* returned to the truck." Indeed, the government asserts seven times in its brief that the record contains evidence that

Begay's demeanor was "calm" and asserts seven times that the record shows Begay was "methodical"; the government also asserts that the record shows Begay behaved "casually" and "thoughtfully." However, as the government finally conceded under persistent questioning at oral argument, the record contains *no* support at all for any of these characterizations. Clark was the *only* witness at trial who saw Begay prior to and during the shooting, and *nothing* in Clark's testimony so much as suggests that Begay behaved in a calm, casual, thoughtful, or methodical fashion. That the government felt it necessary to rely on such unfounded assertions in order to demonstrate the sufficiency of its premeditation "evidence" is telling. Equally important, the government's numerous misrepresentations to the court, designed to persuade us to affirm a conviction that necessitates reversal, raise serious questions as to the propriety of the prosecution's conduct that requires further inquiry by the court.

The misrepresentations that the prosecution made to the jury may have had an even more serious consequence. The government's erroneous statement at closing argument may well have resulted in Begay's convictions for first-degree rather than second-degree murder. In a clearly incorrect statement of the law, the trial prosecutor told the jury, "[Begay] *intended* to kill the occupants of the vehicle. *That's premeditation.*" The prosecutor later reiterated, "when you fire multiple rounds with a rifle into a vehicle . . . , that establishes an intent to kill, that establishes his premeditation." Of course, it is elementary that intent to commit murder does *not* establish premeditation. To the contrary, whereas intent is a necessary element of both first-degree *and* second-degree murder, premeditation is what *distinguishes* first-degree murder *from* second-degree murder. *Quintero,* 21 F.3d at 890 n.3. We need not determine whether the prosecutor's erroneous statements in and of themselves constituted reversible error, but we believe that the statements explain how the jury, having been misled as to the law of premeditation, could have convicted Begay of first-degree murder despite wholly insufficient evi-

dence with respect to that essential element. *Cf. United States v. Rubio-Villareal*, 967 F.2d 294, 297 (9th Cir. 1992) (noting that a jury that is misinstructed on the law might well "convict without finding all the elements of a crime beyond a reasonable doubt").

**[7]** In sum, the testimony of the government's sole eyewitness, taken in the light most favorable to the government, shows nothing more than that Begay flashed his lights at the victims' car, walked over to the car from his truck, stood by the passenger's side of the car for approximately a minute in a position from which he could talk with its occupants, returned to his truck, retrieved his rifle, walked back to the car, and fired eight or nine shots at the victims. There is no evidence whatsoever as to what brought about the murders or as to the defendant's demeanor or state of mind prior to or during the shooting — save for the testimony that he was "pretty drunk." Based on the evidence adduced at trial, it is equally likely that the defendant committed the murders in a fit of rage or otherwise in the heat of passion caused by his exchange with the victims immediately prior to the shooting as it is that he committed the murders with a "cool mind" after reflection. The evidence simply does not permit a rational observer to reach the latter conclusion beyond a reasonable doubt; rather, any determination that Begay did in fact commit the murders with a cool mind after reflection would be pure speculation. We therefore conclude that these facts are insufficient to establish premeditation, the essential element of the crime of first-degree murder.

## III.   REVERSAL OF MURDER CONVICTIONS

Our conclusion that the evidence of premeditation was insufficient to support convictions for first-degree murder necessarily dictates the remedy we must provide: "Where, as here, the evidence is insufficient as a matter of law to support a conviction on the statutory offense upon which judgment was entered, we are required to vacate that judgment and to

enter a judgment of acquittal on that charge." *United States v. Vasquez-Chan*, 978 F.2d 546, 554 n.4 (9th Cir. 1992). Reversal on the ground of insufficiency of the evidence ordinarily requires the automatic vacatur of the challenged conviction and the concomitant bar to punishment or further prosecution on the charge.

**[8]** There is, however, a narrow exception to the general rule. Under that exception, in addition to vacating a conviction on the charge on which the jury returned a verdict, the court may in some circumstances enter a judgment of conviction on a lesser included offense. Here, that lesser-included offense would be second-degree murder. A judgment on the lesser-included offense may be entered in cases in which the evidence is insufficient with respect to the charge of conviction but sufficient with respect to the lesser-included offense. Following the approach adopted in other circuits, this court has held that an appellate court "may direct a lower court to enter a judgment of conviction on a lesser offense after finding a jury's verdict insufficient to support its guilty verdict on a greater offense" only "*in some instances*." *Vasquez-Chan*, 978 F.2d at 553-54 (emphasis added); *see also United States v. Dinkane*, 17 F.3d 1192, 1198 (9th Cir. 1994) (same); *cf. United States v. Jose*, 425 F.3d 1237, 1247 (9th Cir. 2005). Specifically, we have held that:

> [T]he conditions necessary to the entry of such a judgment are as follows: (1) the lesser offense must be a lesser-included offense — a "subset" of the greater one; (2) the jury must have been explicitly instructed that it could find the defendant guilty of the lesser-included offense and must have been properly instructed on the elements of that offense; and (3) *the government must request on appeal* that judgment be entered against the defendant on the lesser offense.

*Vasquez-Chan*, 978 F.2d at 554 (emphasis added) (footnotes omitted). We would add the obvious qualification that the element as to which sufficient evidence was missing with respect to the greater offense must not be a requisite element of the lesser offense as well. *See Dinkane*, 17 F.3d at 1198.[7]

[9] In this case, the first and second *Vasquez-Chan* conditions are satisfied, as the evidence is sufficient to support a conviction for second-degree murder, a lesser-included offense of first-degree murder, and the district court properly instructed the jury that it could convict on that lesser charge. So, too, is the additional qualification we have noted. However, the third "necessary" condition set forth in *Vasquez-Chan* is not satisfied: the government at no point met the requirement that it "*must* request on appeal that judgment be entered against the defendant on the lesser offense." *Id.* at 554 (emphasis added). As we have previously held, courts "apply th[e waiver] rule with some vigor against criminal defendants; we should be no less vigorous in applying it against the government." *Moore v. Czerniak*, 534 F.3d 1128, 1152 (9th Cir. 2008). As *Vasquez-Chan* makes abundantly clear, it is the government's obligation to request that an appellate court convert a defendant's judgment of conviction from one predi-

---

[7]In *Rutledge v. United States*, 517 U.S. 292, 306 (1996), a case decided four years after *Vasquez-Chan*, the Supreme Court noted favorably that "federal appellate courts appear to have uniformly concluded that they *may* direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense." *Id.* (emphasis added). *Rutledge*, however, said nothing whatever about how, when, or under what circumstances the various circuit courts should or could engage in that practice. *Id.* Rather, the Court simply observed that the various circuits had already adopted rules governing the question. *See id.* at 305-06 & n. 15. As our concurring colleague from the Eighth Circuit observes, the Eighth Circuit had adopted one set of conditions, while the Ninth Circuit had adopted those same conditions plus one more. *Compare DeMarrias v. United States*, 453 F.2d 211, 215 (8th Cir. 1972), *with Vasquez-Chan*, 978 F.2d at 554. *See also Rutledge*, 517 U.S. at 305 n.15 (citing *Allison v. United States*, 409 F.2d 445 (D.C. Cir. 1969)).

cated on a charge as to which the evidence was legally insufficient to one predicated on a charge on which the defendant was not actually convicted by a jury of his peers.[8] Imposing the burden on the government in such cases helps protect courts against making errors that are more likely to occur when courts raise issues *sua sponte* and act without the benefit of briefing and argument by counsel. Such a request should be made in the government's initial brief, *see Vasquez-Chan*, 978 F.2d at 554 n.6, so that the defendant may have a full and fair opportunity to oppose it. Because in this case the government has not requested that we enter a judgment of conviction on a lesser-included offense, we vacate Begay's convictions and sentences on the charges of first-degree murder without

---

[8]We note that the law treats differently the situation in which "a jury convicts on *both* the greater and lesser included offenses." *Jose*, 425 F.3d at 1247 (emphasis added). In such cases, the district court is required to "enter a final judgment of conviction on the greater offense and vacate the conviction on the lesser offense. However, if the greater offense is later reversed on appeal [for insufficient evidence], the appellate court should reinstate the previously vacated convictions on the lesser included offenses." *Id.* (internal citation omitted) (citing *Rutledge*, 517 U.S. 292). While this distinction may, at first blush, seem overly formalistic, it in fact reflects an important distinction between two different sets of facts. A jury's deliberations are secret and its rationale for reaching a particular decision is usually unknown — and may not always follow strictly legal or logical parameters. *Cf.* FED. R. EVID. 606(b); *United States v. Dougherty*, 473 F.2d 1113, 1137 (D.C. Cir. 1972) ("The jury system provides flexibility for the consideration of interests . . . outside the formal rules of law."). Accordingly, the conversion of a judgment from a conviction for one offense into a conviction for a different offense *as to which the jury has remained silent* necessarily involves some degree of speculation on the part of the court as to the jury's intent — speculation that is not required when the jury enters a conviction on both counts. While courts in some instances interpret a jury's silence to constitute an implicit acquittal, *see Green v. United States*, 355 U.S. 184, 190 (1957), a higher degree of caution is required when a court considers entering a judgment of *implied conviction*. The requirements set forth in *Vasquez-Chan* ensure that imposition of such an implicit judgment of conviction is warranted and thereby properly protects a defendant's right to liberty and due process of law.

entering convictions on the offense of second-degree murder or any other lesser-included offense.

## IV. AFFIRMANCE OF FIREARM CONVICTIONS

**[10]** Our holding with respect to the insufficiency of the evidence of premeditation does not affect Begay's two convictions for using a firearm "in relation to any crime of violence." 18 U.S.C. § 924(c)(1)(A). Nor does it affect the sentence of thirty-five years in prison that attached to these convictions. Both first- and second-degree murder constitute crimes of violence. *See* 18 U.S.C. § 924(c)(3). Begay's jury was instructed that it could convict him of violating § 924(c) if "the government proved" that he "committed the crime of murder, in *either* the first *or* second degree." As we have stated, *see supra* Part III, the evidence in this case is sufficient to support convictions of murder in the second-degree. Accordingly, it is sufficient to support the relevant element of § 924(c). We therefore affirm the two firearm convictions. *See United States v. Bracy*, 67 F.3d 1421, 1430 (9th Cir. 1995); *see also infra* Part V.

## V. WITNESS INTIMIDATION

**[11]** Our holding with respect to the insufficiency of the evidence of premeditation renders moot all of Begay's other challenges on appeal, save one. That challenge might, if upheld, affect his convictions for using a firearm during the commission of a crime of violence. Begay argues that the district court improperly admitted evidence that he intimidated Clark and Lee, two of the witnesses to the crime. Begay claims that the evidence constituted improper character evidence under Federal Rule of Evidence 404(b) and was unduly prejudicial under Federal Rule of Evidence 403; however, he acknowledges that no objection to the evidence was raised at trial and that its admission is therefore reviewed for plain error. *See id.* at 1432. Here, there was no error at all, as a defendant's threats against a witness are admissible to show

consciousness of guilt. *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996). Moreover, the district court did not err in concluding that the probative value of Begay's threats outweighed any unfair prejudice.

## VI.   CONCLUSION

The record did not contain sufficient evidence that Begay committed "premeditated killings" and therefore the government failed to prove its charges of first-degree murder. Accordingly, we **REVERSE** Begay's convictions for first-degree murder and the life sentences attached to those counts. We **AFFIRM** Begay's two firearms convictions and the thirty-five year sentence imposed on those counts.

**AFFIRMED in part; REVERSED in part.**

---

BRIGHT, Circuit Judge, concurring:

I concur in this court's opinion, but write separately regarding Part III, which deals with the reversal of Begay's murder convictions. If I were writing on a clean slate in the Ninth Circuit, I would direct the district court in this case to enter a judgment of conviction on the lesser-included offense of second-degree murder. However, I am bound by *United States v. Vasquez-Chan*, 978 F.2d 546 (9th Cir. 1992), which mandates a procedure that when, as in this case, the conviction for the greater offense is in issue and may be reversed, the government must request such possible relief in its opening brief.

This requirement is not the rule in similar cases in other circuits. In *DeMarrias v. United States*, 453 F.2d 211, 215 (8th Cir. 1972), for example, the court determined that implicit in a jury's finding of guilt on a second-degree murder charge was a finding of guilt on the lesser-included charge of manslaughter. Therefore, when the court set aside the second-

degree murder conviction for insufficient evidence, it directed "a remand for resentencing on the voluntary manslaughter charge as an appropriate means to accomplish substantial justice." *DeMarrias*, 453 F.2d at 215;[1] *see also United States v. Cobb*, 558 F.2d 486, 489 (8th Cir. 1977).

Additionally, the Supreme Court has stated concerning this issue:

> Consistent with the views expressed by the District of Columbia Circuit, federal appellate courts appear to have uniformly concluded that they may direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense. This Court has noted the use of such a practice with approval.

*Rutledge v. United States*, 517 U.S. 292, 306 (1996) (citations omitted). Both *Rutledge* and *DeMarrias* cite with approval the views of the D.C. Circuit in *Austin v. United States*, 382 F.2d 129, 140-43 (D.C. Cir. 1967), *overruled on other grounds*, *United States v. Foster*, 783 F.2d 1082, 1085 (D.C. Cir. 1986) (en banc).

As a visiting judge in the Ninth Circuit, I am bound by *Vasquez-Chan*, which obligates the government, in a case such as this one, to request on appeal a lesser-included offense before the court may enter such judgment. The *Vasquez-Chan* rule has been on the books for seventeen years, and other Ninth Circuit cases have availed themselves of this rule. *See United States v. Jose*, 425 F.3d 1237, 1247 (9th Cir. 2005); *United States v. Dinkane*, 17 F.3d 1192, 1198 (9th Cir. 1994). I do observe that this requirement may be a salutary one because it provides notice to the defendant that while a

---

[1]*DeMarrias*, in which I was the author of the opinion, is the reason for this separate concurrence.

court might not sustain the greater offense, it might sustain a lesser-included offense. However, such a requirement is not present in some other jurisdictions.

Accordingly, I concur in Part III of the opinion because I am bound by the *Vasquez-Chan* requirements relating to the entry of judgment for a lesser-included offense in appropriate cases. As the opinion of the court has observed, these requirements were not fully met by the government.