**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

KENDERICK BEGAY,
a.k.a. Kendrick Begay,
            *Defendant-Appellant.*

No. 07-10487

D.C. No.
CR-06-00626-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
March 23, 2010—San Francisco, California

Filed January 12, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Sidney R. Thomas, Barry G. Silverman,
M. Margaret McKeown, Kim McLane Wardlaw,
Raymond C. Fisher, Marsha S. Berzon, Richard R. Clifton,
Consuelo M. Callahan and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Reinhardt

## COUNSEL

Daniel L. Kaplan, Assistant Federal Public Defender, Phoenix, Arizona, for the appellant.

John R. Lopez, Assistant United States Attorney, Phoenix, Arizona, for the appellee.

## OPINION

CLIFTON, Circuit Judge:

Kenderick Begay appeals his convictions on two counts of first-degree murder in violation of 18 U.S.C. §§ 1111(a) and 1153(a), and two counts of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Begay's principal argument on appeal is that the evidence introduced at trial, even when taken in the light most favorable to the prosecution, fails to establish that he acted with premeditation and thus fails to support his convictions for first-degree murder. We conclude that there was sufficient evidence to establish premeditation and affirm the convictions.

## I.   Background[1]

In the early morning hours of March 28, 2002, Kenderick Begay[2] drove his truck through the Navajo Indian Reservation[3] in Greasewood, Arizona, after leaving a gathering at the "windmill," an area in town where the youth partied. His passengers included his sister Mecheryl Begay, Loren Clark, Emmanley Begay, and Jessica Lee. When a car passed them traveling in the opposite direction sometime around 2:00 a.m.

---

[1]Most of the background section of this opinion is drawn directly from the opinion of the three-judge panel that initially heard this case. *See United States v. Begay*, 567 F.3d 540 (9th Cir. 2009).

[2]The record reflects that "Begay" is a common surname in the Navajo Nation and does not always reflect a familial relation between two individuals bearing that name. In this case, four relevant parties bear the surname Begay: the defendant, his sister Mecheryl, a man named Emmanley, and a man named Larry. The latter two bear no familial relation to the first two or to each other. We refer to the defendant by his surname and to the other Begays by either their first or full names.

[3]Begay was charged under the federal murder statute pursuant to the Indian Major Crimes Act, 18 U.S.C. § 1153, which extends federal criminal jurisdiction to cover specific crimes, including murder, committed by Indians in Indian Country.

or 3:00 a.m., Begay turned his truck around. The other car turned around as well. When the two vehicles passed each other again, Begay flashed the lights of his truck, a signal that resulted in stopping the other car. The two vehicles pulled off the highway and onto a dirt road. Begay got out of his truck and walked to the driver's side of the other car. Two high school students, J.T. and O.C.,[4] were in the car; O.C. was in the driver's seat and J.T. was in the front passenger's seat.

After about a minute of standing by the driver's side of the car, Begay walked back to his truck. He reached under the driver's seat, pulled out a .30 caliber rifle, and walked back to the passenger's side of the car. Begay shot eight or nine times through the passenger-side front window, shattering the glass. Six of the bullets hit J.T., while some of the shots missed, hitting the driver's side door. One of the bullets that struck J.T. passed through him and hit O.C.

After firing the shots, Begay walked back to his truck and put the gun under the back seat. Clark, who had gotten out of the truck prior to the shooting to relieve himself, "just stood there" before asking, "What the hell are you doing?" Begay did not answer. His sister Mecheryl ran up to him making "horrible cries" and yelling at him, screaming, "What did you do?" or "Why did you do that?" Begay told her to be quiet. Clark walked over to the car and saw J.T. gasping for air and O.C. sitting in her seat. Clark again asked Begay why he shot the victims, but Begay did not respond.

Begay, Mecheryl, and Clark got back into the truck and drove away. Lee remained behind. Up until the shooting, she had been in a comatose state in the rear of the truck as a result of having consumed too much alcohol. The gunshots roused her from her stupor, at which point she felt an immediate need to vomit and exited the truck to do so. Lee did not reenter the

---

[4]Because the victims were minors, we refer to them using only their initials. *See* 18 U.S.C. § 3509(d).

vehicle following the shooting, but instead walked home from the crime scene. As she passed O.C.'s car, she saw O.C. trying to hold J.T. upright and saw that J.T.'s shirt was bloody.

O.C. managed to drive her car to a nearby housing area, where she sought help from Rosita Clark, Loren Clark's mother. By the time O.C. and J.T. arrived, J.T. was already dead. O.C. was transported to a nearby hospital before being transferred to a hospital in Albuquerque, New Mexico, where she died from her wounds three days later.

FBI agents and Navajo investigators began to investigate the crime immediately. They interviewed numerous people, including Begay, who denied being out the night of the murders and stated that he had been with his girlfriend the entire time. Investigators learned from other sources, however, that Begay might have been at the party the victims attended. Approximately two weeks after the murders, investigators located the crime scene, where they found glass on the ground and six .30 caliber shell casings. After this discovery, the agents continued to investigate for several months but failed to make any further progress.

The investigation's first break came six months after the shooting, in the autumn of 2002, when Jessica Lee contacted the FBI about the murders. She eventually told the FBI, and later testified at trial, that she had been present at the party and left with Begay, Mecheryl, Clark, and Emmanley. Lee admitted that alcohol impaired her memory, but stated that she remembered leaving the party with that group, that, after having passed out, she woke up at the sound of gunshots, and that she saw the victims after they had been shot. She also testified that a few days after the murders, she asked Begay what she should tell the police and that he told her to blame the murders on two other men. Lee and Begay never spoke about the murders again.

The next major development in the investigation came four years after the shooting, in May 2006, when the FBI contacted

Clark. Other than Lee, Clark was the only percipient witness who testified at trial. Moreover, as Lee witnessed only the shooting's aftermath, Clark was the sole witness to testify as to the events leading up to the shooting or the details of the shooting itself.

Clark testified that when the two cars pulled over, he exited Begay's vehicle to relieve himself. Because he was standing at the rear of Begay's truck while Begay was standing alongside the victim's car, he could only see Begay "[f]rom quite a distance." In fact, Clark described Begay as appearing as simply "a black figure" in the night. Clark testified that he saw Begay stand by the car for "just a minute or so" and then come "walking back . . . to his truck." Clark could not see what Begay retrieved from the truck, but saw that he "reached under the driver's side . . . seat," retrieved something, and then returned to the victim's car. At that point, according to Clark, he saw Begay lift the object that he had retrieved from the truck "up on his shoulder and just s[aw]—just s[aw] sparks." Along with the sparks, Clark heard gunshots, which he recognized as coming from a rifle that Begay had used on previous occasions when he and Clark had gone shooting together. When the gunfire ceased, Clark asked Begay why he had shot the victims, but received no explanation. Instead, Begay told him to get back into the truck, which he did. Begay dropped Clark off at his house immediately following the murders and told him to keep quiet. The next morning, Begay told Clark to say nothing to the FBI and "to watch himself." At various times following the murders, Begay told Clark to "watch his back."

A jury convicted Begay on two counts of first-degree murder and two counts of using a firearm during a crime of violence. The district court imposed mandatory concurrent life sentences for each murder conviction as well as consecutive 120-month and 300-month sentences, or a total of thirty-five years, for the firearm convictions.

A three-judge panel of our court reversed Begay's first-degree murder convictions, concluding that the evidence was insufficient for the jury to find that the killings had been premeditated. *See United States v. Begay*, 567 F.3d 540, 550 (9th Cir. 2009). The panel decision affirmed the convictions for using a firearm during a crime of violence.

We granted the government's petition for rehearing en banc. *United States v. Begay*, 591 F.3d 1180 (9th Cir. 2010).

## II. Sufficiency of the Evidence

**[1]** Begay contends that the evidence of premeditation was insufficient to convict him of first-degree murder. Murder is defined in the relevant statute as follows:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).

**[2]** Premeditation is not required for all forms of first-degree murder, but it is undisputed that premeditation is a required element of first-degree murder as charged against Begay. Therefore, in this case, premeditation is the essential

element that distinguishes first-degree and second-degree murder. *See United States v. Quintero*, 21 F.3d 885, 890 n.3 (9th Cir. 1994). Without proof of premeditation, Begay could not be convicted of first-degree murder.

The jury in this case was instructed, following our circuit's model jury instructions, that

> Premeditation means with planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing.

9th Cir. Model Crim. Jury Instr. 8.89 (2003). Begay did not object to that instruction at trial and has not done so in this appeal.

**[3]** Premeditation can be proved by circumstantial evidence. *United States v. Free*, 841 F.2d 321, 325 (9th Cir. 1988). Relevant circumstantial evidence includes but is not limited to "the defendant's prior relationship to the victim, the defendant's carrying of the murder weapon to the scene, and the manner of the killing." *Id.*; *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2009) (highlighting "planning activity," "motive," and the "nature of the killing" as probative evidence) (emphasis omitted).

Whether a defendant acted with premeditation is a factual question for the jury to decide. And a jury's verdict is not to be disturbed lightly. As the Supreme Court established in *Jackson v. Virginia*, a challenge to the sufficiency of the evidence to support a criminal conviction requires us to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979).

**[4]** A unanimous en banc panel of our court recently held in *United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc), that *Jackson* established a two-step process:

> First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. Rather, when "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."
>
> Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." This second step protects against rare occasions in which "a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." More than a "mere modicum" of evidence is required to support a verdict. At this second step, however, a reviewing court may not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," only whether "*any*" rational trier of fact could have made that finding.

*Nevils*, 598 F.3d at 1164 (citations, omissions, and alterations omitted) (quoting *Jackson*, 443 U.S. at 319-20, 326).

We turn to the evidence presented at trial in this case. The first step under *Nevils* requires us to consider the evidence in

the light most favorable to the prosecution, resolving conflicts in favor of the government's case. At least four pieces of evidence were relevant to whether Begay acted with planning or deliberation in killing his victims and whether there was sufficient time for him to plan or deliberate.

**[5]** First, the jury could reasonably infer, from Loren Clark's testimony, that Begay walked back to his truck after talking to O.C. and J.T., got a gun from under the back seat and then returned to shoot the victims. Carrying the murder weapon to the scene is strong evidence of premeditation. *See Free*, 841 F.2d at 325; *United States v. Talbert*, 710 F.2d 528, 531 (9th Cir. 1983) ("If the jury determined that the killer picked up the murder weapon and carried it back seventy-five feet to [the victim's] room, its finding of premeditation was justified."); *see also Belton v. United States*, 382 F.2d 150, 152 (D.C. Cir. 1967) ("[T]hat appellant entered the apartment with a loaded gun . . . permitted an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill."). Leaving the scene to retrieve a weapon is even stronger evidence of premeditation because it suggests that Begay had formed a plan for committing the murders and then set about carrying it out.

**[6]** Second, Clark testified that Begay walked both ways between his truck and O.C.'s car. There was no evidence that he was agitated or rushed. The jury could reasonably infer that he had enough time to become fully conscious of his intent to kill and to consider the killing.

**[7]** Third, Clark testified that when Begay returned to O.C.'s car, he went to the passenger's side, where J.T. was sitting, even though he had initially spoken to O.C. and J.T. from the driver's side. The jury could reasonably infer that he did so to get a clearer shot at J.T. *See Jackson*, 443 U.S. at 325 ("[T]he . . . shots that killed the victim were fired at close, and thus predictably fatal, range by a person who was experienced in the use of the murder weapon."). Like the defendant

in *Jackson*, Begay fired from close range: Clark testified that Begay was at most four feet away from the car when he fired.

**[8]** Finally, Clark testified that Begay did not answer when, after the shooting, Clark asked what he had done. He also testified that Begay's sister, Mecheryl, yelled something like "What did you do?" to Begay at that point, and Begay told her to shut up and be quiet. The jury could reasonably infer that Begay was acting with a cool mind. *Cf. id.* at 325 ("The petitioner's calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder.").

The second step under *Nevils* requires us to consider whether this evidence, including the inferences drawn in the prosecution's favor, was adequate to permit a rational juror to conclude that each essential element of the charge was proved beyond a reasonable doubt. This second step allows us to fulfill "our obligation under *Jackson* to identify those rare occasions in which 'a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt.' " *Nevils*, 598 F.3d at 1167 (omissions and alterations omitted) (quoting *Jackson*, 443 U.S. at 317). For example, we cannot uphold a verdict where "mere speculation, rather than reasonable inference, supports the government's case." *Nevils*, 598 F.3d at 1167 (citing *Juan H. v. Allen*, 408 F.3d 1262, 1277-79 (9th Cir. 2005)).

**[9]** The evidence we described in step one, viewed in the light most favorable to the prosecution, was sufficient for a rational juror to conclude that Begay acted with planning or deliberation in shooting J.T. and that he had enough time to do so.[5] Each of the inferences we described is reasonable

---

[5]The evidence was sufficient to conclude that Begay premeditated killing J.T., so it was not necessary for the jury to decide separately whether Begay also premeditated killing O.C., his other victim. *See* 18 U.S.C. § 1111(a) ("Every murder . . . perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed . . . is murder in the first degree.").

because it is "supported by a chain of logic," which is all that is required to distinguish reasonable inference from speculation. *Juan H.*, 408 F.3d at 1277. In this case, therefore, step two is simple. Nothing more was needed for a rational juror to conclude beyond a reasonable doubt that Begay acted with premeditation.[6]

Begay argues that because there was no evidence presented at trial to establish a motive on the part of Begay to kill J.T. or O.C. or to prove that Begay had a prior relationship with them, it would have been irrational for a juror to conclude that Begay premeditated the killings. But although evidence of motive or of a past relationship often helps to establish a given defendant's guilt, neither motive nor a past relationship is an element of first-degree murder. *See United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir. 1989); *see also* 18 U.S.C. § 1111(a).

**[10]** A rational juror could have concluded beyond a reasonable doubt from the evidence concerning Begay's activity and the manner of killing that Begay acted with premeditation. *See Free*, 841 F.2d at 325; LaFave, *supra*, § 14.7(a). Begay does not contest the sufficiency of evidence as to any other element of first-degree murder. The evidence was therefore sufficient to support the jury's verdict and the convictions for first-degree murder.

---

[6]While we have examined several pieces of evidence to determine whether the evidence as a whole was sufficient to support Begay's conviction, we do not mean to imply that the evidence would have been insufficient in the absence of any of these pieces. Nor do we mean to imply that the evidence in this case represents a minimum level of evidence for the government to produce in other cases involving premeditation. The analysis under *Jackson* and *Nevils* must be applied to each criminal appeal in which the sufficiency of evidence is at issue. Whether the evidence in a given case is sufficient to prove an element of a crime always depends on the specific evidence produced in that case.

## III.   Other Challenges

Begay raises a number of other arguments that we can address without extended discussion. None persuades us to reverse the conviction or to remand for any further proceedings.

### A.   *Voluntary Manslaughter Instruction*

**[11]** Begay argues that the district court erred by declining to instruct the jury on the lesser crime of voluntary manslaughter. *See* 18 U.S.C. § 1112(a); *United States v. Paul*, 37 F.3d 496, 499 (9th Cir. 1994). We review the refusal to instruct on a lesser included offense for abuse of discretion. *See United States v. Naghani*, 361 F.3d 1255, 1262 (9th Cir. 2004). A murder defendant is not automatically entitled to a voluntary manslaughter instruction. The defendant must produce evidence "that the defendant was acting out of passion rather than malice" before the burden shifts to the government to "prove beyond a reasonable doubt the *absence* of sudden quarrel or heat of passion." *Quintero*, 21 F.3d at 890 (citing *United States v. Lesina*, 833 F.2d 156, 160 (9th Cir. 1987)). Begay relies on *United States v. Hernandez*, 476 F.3d 791 (9th Cir. 2007), but that case is inapposite. In *Hernandez*, the evidence at trial was sufficient to allow a rational jury to find the defendant guilty of a lesser included offense, so the defendant had no obligation to introduce additional evidence. *See id.* at 801. Here, Begay's trial counsel conceded that there was no evidence of provocation. Begay failed to meet his burden of production, so the district court did not abuse its discretion by refusing to give the requested instruction. *See United States v. Wagner*, 834 F.2d 1474, 1487 (9th Cir. 1987).

### B.   *Evidence of Witness Intimidation*

**[12]** Begay argues that evidence showing that he sought to intimidate the witnesses against him was inadmissible under Federal Rules of Evidence 403 and 404(b). Specifically,

Begay challenges the admission of Clark's testimony that he was afraid to talk to investigators after Begay told him to keep quiet and to watch himself. He also challenges Jessica Lee's testimony that Begay told her to blame the murders on other people. Because Begay did not object to this evidence at trial, we review for plain error. *See United States v. Banks*, 514 F.3d 959, 975-76 (9th Cir. 2008). There was no error. First, the evidence in question was admissible to show Begay's consciousness of guilt. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996). Second, its probative value outweighed any danger of unfair prejudice because the evidence also tended to explain why Clark and Lee delayed coming forward to investigators until they each had moved away from Greasewood.

**[13]** Begay also contends that he was not given reasonable notice by the government that it would introduce this evidence of his other wrongful acts. The government was not required to provide such notice unless Begay requested it. *See* Fed. R. Evid. 404(b) (duty triggered "upon request by the accused"); *United States v. Vega*, 188 F.3d 1150, 1154 (9th Cir. 1999). Begay cites no request for notice, and our review of the record has not revealed one. Even if Begay did request notice and the government failed to provide it, the decision to admit the evidence does not require reversal. We recognize plain errors only if they seriously undermine "the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cruz-Perez*, 567 F.3d 1142, 1146 n.1 (9th Cir. 2009). That did not happen here: The government disclosed the evidence itself and said specifically in its opening statement that some of it would be introduced. The defense had an opportunity to cross-examine the government's witnesses about the evidence. And the district court had no reason to suspect a notice problem absent an objection.

## C. Prosecutorial Misconduct

Begay argues that the prosecutor committed misconduct by misstating the elements of first-degree murder during closing

argument. We review the prosecutor's statement for plain error because no objection was raised at trial. *See United States v. Romero-Avila*, 210 F.3d 1017, 1021-22 (9th Cir. 2000).

The prosecutor made the following statement, which Begay insists is a justification for a new trial:

> He knew exactly what he was doing. He intended to kill the occupants of the vehicle. That's premeditation. He intended it. He was conscious of it. That's first degree murder.

**[14]** The prosecutor did make a mistake in saying "that's premeditation" right after she said "he intended to kill the occupants of the vehicle." Intent is not the same thing as premeditation. But we consider the misstatement in context. The court properly instructed the jury on the correct definition, and an instruction carries more weight than an argument. *Boyde v. California*, 494 U.S. 370, 384-85 (1990); *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (holding that a jury is presumed to follow a judge's instructions). Plus, the prosecutor correctly stated the law shortly before the misstatement, explaining that " '[p]remeditation' means planning or deliberation. The amount of time needed . . . must be long enough after forming the intent to kill for the killer to have been fully conscious of the intent and to have considered the killing." The misstatement did not prejudice Begay, so there was no plain error. *See United States v. Medina-Casteneda*, 511 F.3d 1246, 1249-50 (9th Cir. 2008).

### D. Cumulative Error

Begay argues that the cumulative effect of the issues he raises deprived him of a fair trial. We have not recognized any error below, so there is no cumulative prejudicial effect to analyze. *See, e.g.*, *United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007).

## IV. Conclusion

The evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational juror to conclude that Kenderick Begay acted with premeditation in killing his victims. His other arguments also lack merit.

**AFFIRMED.**

---

REINHARDT, Circuit Judge, with whom Judges THOMAS and BERZON join, dissenting:

This is a case in which there is no conflict among circuits, no intra-circuit conflict, and no issue of national importance. The court went en banc not over any legal issue, but only to decide whether a few specific facts identified in the majority opinion were sufficient to warrant a finding of premeditation. A similar combination of facts is not likely to occur again in a future case, especially as there are few federal murder cases —this one happened on an Indian reservation—and even fewer in which the question whether the murder was first- or second-degree hinges exclusively on whether there is sufficient circumstantial evidence to prove premeditation. Nevertheless, a majority of this court decided that it was worthy of en banc review when the three-judge panel found that the prosecution had failed to prove murder in the *first* as opposed to *second* degree. Because I disagree with the majority that the minimal facts that it sets forth in its opinion are sufficient to establish premeditation beyond a reasonable doubt, whatever reasonable inferences may be drawn, I dissent.

It is an elementary principle of our criminal justice system that in a criminal prosecution the government bears the burden of providing *proof* that establishes the defendant's guilt beyond a reasonable doubt, including the degree of the offense charged. The rule applies to each element of a crimi-

nal offense. It "gives concrete substance to the presumption of innocence, [ensures] against unjust convictions, and [reduces] the risk of factual error in a criminal proceeding." *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) (quoting *In re Winship*, 397 U.S. 358, 363 (1970)). The prosecution's affirmative obligation to produce sufficient evidence of guilt enforces this rule, by guaranteeing the accused that the government will not convict him by appealing to a jury's prejudices, or on the basis of its speculations or arbitrary whims. It is in this light that we examine a conviction to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" *Id.* at 319. In this case, the majority's opinion renders without substance this fundamental protection against arbitrary convictions or convictions based upon mere speculation.

The government charged Kenderick Begay with first-degree murder for two simultaneous killings that he carried out in the early morning of March 28, 2002. In order to convict Begay of first-degree murder the government was required to prove beyond a reasonable doubt not only that he intended to kill one of the victims, J.T., and killed him deliberately, or with malice aforethought,[1] but that Begay had premeditated or planned that murder by reflecting on it for some period of time with a cool mind.[2] 2 Wayne R. LaFave, *Sub-*

---

[1]Malice aforethought, a concept distinct from premeditation, is an element of both first- and second-degree murder under the federal murder statute. *See* 18 U.S.C. § 1111(a).

[2]The record strongly suggests that Begay intended to kill only J.T., who was struck by six bullets, and not his second victim, O.C., who was killed by a bullet that struck her only after passing through J.T. Under the federal murder statute, any murder that results from a premeditated plan to kill is first-degree murder, regardless of whether the victim was the intended target of the killer's premeditated plan. 18 U.S.C. § 1111(a). Thus, though Begay was convicted of two counts of first-degree murder, the relevant question is whether he intended and premeditated J.T.'s death. *See Maj. Op.* at 681 n.5.

*stantive Criminal Law* § 14.7(a) (2d ed. 2009). It is undisputed that the prosecution presented none of the evidence traditionally offered to prove premeditation. It presented no evidence that Begay had planned J.T.'s killing,[3] no evidence that Begay had a motive to kill J.T., no evidence that Begay had any prior relationship with the victim, no evidence regarding Begay's demeanor during the time of the killing, and no evidence that the manner in which the killing was committed was particularly calculated or methodical.[4] *See, e.g.*, LaFave, *supra*, § 14.7(a) (listing "planning activity," "motive," and "nature of the killing" as important types of circumstantial evidence for proving premeditation). Instead of pointing to such traditional sources of proof of premeditation, the majority relies on four items of evidence that it asserts supported an inference of premeditation that could have established that element beyond a reasonable doubt in the mind of a rational finder of fact: (1) after whatever occurred between Begay and J.T. during their first encounter at the window of the car in which J.T. was sitting, Begay returned to his adjoining truck and retrieved his rifle; (2) Begay walked between

---

There is no dispute in this case that the government's evidence was sufficient to convict the defendant of second-degree murder, the essential elements of which are an unlawful killing, malice aforethought, and intent. *See United States v. Quintero*, 21 F. 3d 885, 890 n.3 (9th Cir. 1994); 18 U.S.C. § 1111(a). The only question is whether the government presented sufficient evidence to establish premeditation, which is the essential element that distinguishes first- and second-degree murder. *See Quintero*, 21 F. 3d at 890 n.3.

[3]If Begay's retrieval of his rifle from his truck which was parked nearby to O.C.'s car and his decision to approach the passenger's side window prior to shooting constitute "planning activity," then it is difficult to imagine any actions in an intentional and deliberate murder (second degree) to which the term premeditated would not also apply.

[4]To the contrary, the record reflects that, despite his practice and experience with the weapon used during the shooting, and despite the fact that he was only three to four feet away from the victim when firing, Begay missed a number of times. This suggests, if anything, agitation, excitement, or frenzy, not the "cool mind" of premeditation.

his truck and the victims' car; (3) Begay returned to the passenger's side of the victims' car, presumably to get a clear shot at J.T.; and (4) Begay told his sister to shut up *after* the shooting and did not answer when another passenger asked him what he had done.

Even this brief recitation makes clear that none of these items of evidence on which the prosecution relies supports a reasonable inference that Begay planned or premeditated J.T.'s murder—that Begay not only had the opportunity to deliberate the killing with a cool mind, but that he actually did so. The evidence presented by the prosecution allows only for speculation as to that crucial question. If, as the majority's opinion suggests, first-degree murder can be established whenever a defendant simply has enough time to premeditate or when he seeks a "clearer shot" at a victim or reacts angrily or ignores a question after the shooting, then the difference between first- and second-degree murder has effectively ceased to exist. So, too, if premeditation can be shown by the defendant's retrieving from a few feet away a weapon that is legitimately present at the site of the murder.[5] It is difficult to conceive of any intentional, deliberate murder with malice aforethought that, based upon the majority's opinion, would

---

[5]The majority does not contend that any inference of premeditation may be drawn from the fact that on the morning of the murder Begay had under the front seat of his truck a rifle that he ordinarily used for peaceful purposes. Loren Clark, the government's only witness to the actual shooting, testified that he recognized the weapon that was being fired "[b]ecause [he] used to go shooting with [the defendant] and [they] shot this [particular] rifle a couple of times [before]." The mere fact that an individual has in his possession a weapon does not support premeditation if the weapon is one that he routinely carries for use in a legal or nonviolent fashion. "That [the defendant] used a knife to accomplish the murder is not probative of premeditation and deliberation because he did not procure it specifically for that purpose but rather carried it about with him as a matter of course." *Austin v. United States*, 382 F.2d 129, 139 (D.C. Cir. 1967), *overruled on other grounds by United States v. Foster*, 783 F.2d 1082, 1085 (D.C. Cir. 1986). Nor, in the state of Montana, is possession in a vehicle of a rifle that is used for shooting as a form of outdoor activity.

not present one or more of the majority's hallmarks of premeditation. If the distinction between first- and second-degree murder is to retain any substance, as it must given the sentencing consequences that flow from it, it is incumbent on the government not only to prove that the defendant *may* have premeditated, but to establish that the defendant actually did so, and to establish the element of premeditation beyond a reasonable doubt. *See* LaFave, *supra,* § 14.7(a) ("There is no presumption that the murder is first degree murder; for the higher degree there must be some affirmative evidence to support a finding that the defendant in fact did premeditate and deliberate."); *see also Austin*, 382 F.2d at 133-36 (providing historical review of the distinction between first- and second-degree murder and emphasizing the need for "careful attention to the requirement of premeditation and deliberation"). While the prosecution may present circumstantial evidence that would allow a rational finder of fact to draw an inference that a defendant actually premeditated a murder, no such evidence has been presented by the prosecution in this case, as a close examination of the four items of evidence relied on by the majority clearly reveals.

The first item is that Begay retrieved his rifle from his truck, which was parked besides or behind the car in which J.T. was sitting, immediately after an interaction of some sort between the two young men at the site of the killing. That evidence does not warrant the inference that Begay planned or otherwise reflected with a cool mind upon the commission of the murder. The majority does not contend that premeditation is shown by the fact that Begay was driving with his rifle in the truck when he arrived at the location where the two vehicles parked near each other—only by the fact that he retrieved it from his truck after his initial encounter with J.T. The majority asserts that Begay's retrieving of the rifle evidenced premeditation because premeditation can be proven by a defendant's "carrying the murder weapon to the scene." *Maj. Op.* at 680. But the notion that Begay's truck constituted a separate "scene" from which Begay obtained the weapon after

the interaction at the window of the car is wholly contrary to the record. What little testimony there was on the location of the two vehicles suggests that they were parked immediately adjacent to one another: one prosecution witness testified that the vehicles were parked "side by side" and answered affirmatively when asked whether the "cars were parked relatively close together"; another testified that Begay had parked his truck "behind the [victims'] car." Carrying a weapon to a murder scene may in some circumstances support an inference of premeditation because it suggests that the defendant "arrived on the scene already possessed of a calmly planned and calculated intent to kill." *See Belton v. United States*, 382 F.2d 150, 152 (D.C. Cir. 1967). But the logic supporting that inference does not hold where, as here, the murder occurs at a place directly adjacent to the location from which the defendant retrieved the weapon. Obtaining the gun from a vehicle already at the scene does not bear the hallmarks of calculation and planning.

It is, of course, possible that, as the majority asserts, Begay "formed a plan for committing the murders and then set about carrying it out," *Maj. Op.* at 680, and that he did so after deliberating with a cool mind, while walking from one vehicle to the other and back. Admittedly, he had the time to do so, but without knowing what occurred between Begay and J.T. in their encounter before Begay retrieved his rifle, and without any evidence as to his demeanor, or how he appeared to be acting when he obtained the weapon and returned to the victims' car, there is simply no basis other than speculation for any rational trier of fact to so conclude beyond a reasonable doubt. Begay may have had a "cool mind" and deliberated on his actions as he walked to his truck to retrieve his rifle and immediately returned to O.C.'s car, or he may have been unable to reflect upon his actions in a calm state due to anger or some other highly emotional reaction to some perceived provocation, or he may, as the government's chief eyewitness testified, simply have been "pretty drunk" at the time he retrieved the rifle from his truck. In short, the record is

silent on the matter of whether Begay deliberated with a cool mind before forming the intent to kill J.T. The mere fact that Begay retrieved a weapon from a vehicle parked "side by side" with the victims' car allowed the jury only to speculate impermissibly as to premeditation, and was without question not evidence that would allow any reasonable juror to infer premeditation beyond a reasonable doubt.

The majority next argues that premeditation can be inferred from Loren Clark's testimony that Begay walked between his truck and O.C.'s car. This walking is significant, the majority asserts, for two reasons. The first is that "there was no evidence that [Begay] was agitated or rushed." *Maj. Op.* at 680. The majority's belief that a conviction for premeditated murder can be obtained whenever a defendant walks from one point to another during a killing unless he presents evidence that he was walking in an "agitated or rushed" manner could be dismissed as unworthy of consideration were it not so insidious: it is the prosecution, not the defense, that bears the burden of proof in a criminal trial. If the government wished to use Begay's demeanor as a basis for convicting him of first-degree murder, it was *its* burden to present evidence that Begay was *not* agitated or disturbed when he walked from one vehicle to another. At trial, the government did not avail itself of its opportunity to ask its own witness, Clark, whether Begay appeared "agitated or rushed," nor did it present any other evidence regarding Begay's demeanor when he walked from one vehicle to the other. The majority absolves the government of its burden of presenting such evidence, instead inferring premeditation from the *absence* of evidence regarding Begay's demeanor. That there is "no evidence that Begay was agitated or rushed," *Maj. Op.* at 680, is exactly what it sounds like—*no evidence*—no evidence that he was agitated *or* that he exhibited a cool manner. The majority's contrary conclusion contradicts centuries-old principles of American

criminal justice, imposing upon murder defendants the burden of proving they were *not* calm while committing a murder.[6]

The majority also asserts that Begay's walking helps prove premeditation because it shows "he had enough time to become fully conscious of his intent to kill and to consider the killing." *Maj. Op.* at 680. But while "enough time" is a necessary condition for establishing premeditation, it is not a sufficient one. If "enough time" to premeditate were all that need be shown to sustain a first-degree murder conviction, the government could meet the burden of establishing first-degree murder in almost every murder case, and there would be little reason to establish two categories of offenses, first- and second-degree murder, other than to allow the prosecution to decide as a matter of its own whim or bias which defendants should be punished for "first-degree" murder and which for "second-degree," and in some instances which should be executed and which should be imprisoned. In a country of laws,

---

[6]That the government was aware that it had an obligation to establish the manner in which Begay walked between the two vehicles is evident from its opening brief on appeal, in which it falsely asserted that Clark testified that he "watched as [the] defendant calmly returned to his truck" to retrieve the gun and "methodically retrieved the rifle." Indeed, the government asserted seven times in its brief that the record contains evidence that Begay's demeanor was "calm" and asserted seven times that the record shows Begay was "methodical"; the government also asserted that the record shows Begay behaved "casually" and "thoughtfully." However, as the government finally conceded under persistent questioning at oral argument during the three-judge panel, the record contains no support at all for any of these characterizations. That the government felt it necessary to rely on such unfounded assertions in order to attempt to demonstrate the sufficiency of its premeditation "evidence" demonstrates that it was well aware that the record did not contain sufficient evidence that Begay acted coolly and deliberately to sustain a conviction for first-degree murder. Perhaps the government would not have felt compelled to provide these false characterizations of Begay's behavior had it known that the majority would fail to uphold the principle that the government bears the burden of proof in a criminal trial, and would instead permit an inference that Begay acted calmly and methodically wherever he failed to affirmatively prove the opposite.

however, the prosecution must do more than show in a case such as this that some span of time transpired before a fatal act occurred. The government must also introduce evidence, circumstantial or otherwise, supporting the conclusion that the defendant "*did, in fact,* reflect" upon the decision to commit murder and then committed that act with a cool mind. *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983); *see also* LaFave, *supra*, § 14.7(a) ("It is not enough that the defendant is shown to have had time to premeditate and deliberate. One must actually premeditate and deliberate . . . ."). That Begay walked the short distance from his truck to O.C.'s car, and back, and thus had time to premeditate, cannot establish that he *did* premeditate. It therefore cannot logically serve as "sufficient evidence" for a finding of premeditation. *See, e.g.*, *Hemphill v. United States*, 402 F.2d 187, 189 (D.C. Cir. 1968) ("But the jury may not find premeditation solely from the fact that defendant had time to premeditate."); *State v. Garcia*, 837 P.2d 862, 868 (N.M. 1992) ("We do not dispute the State's contention that Garcia had sufficient time to form a deliberate intention to kill. . . . Garcia certainly could have formed a deliberate intent during the ten to fifteen minutes while going from the back yard to the front yard, but nothing in the evidence enabled the jury to infer that this is when he formed the requisite deliberate intent, or that he ever formed such an intent."); *see also United States v. Catalan-Roman*, 585 F.3d 453, 467 (1st Cir. 2009) ("With respect to premeditation, 'it is the fact of deliberation, of second thought[,] that is important.' ") (citation omitted).

The third item of evidence that the majority contends supports a finding of premeditation is Clark's testimony that Begay "went to the passenger's side, where [his intended victim] J.T. was sitting" prior to shooting him. This, according to the majority, supports an inference "that [Begay] did so to get a clearer shot at J.T." Indeed it may, but the fact that Begay wanted a clear shot at J.T. simply establishes that Begay intended to kill J.T and that he did so deliberately; not that he had reflected or premeditated upon the killing with a

cool mind. Intent and premeditation are, as the majority acknowledges, separate and distinct elements of first-degree murder. *Both* are required. Intent alone will not suffice.[7] *See United States v. Quintero*, 21 F.3d 885, 890 n.3 (9th Cir. 1994); *United States v. Free*, 841 F.2d 321, 325 (9th Cir. 1988) (distinguishing between "malice aforethought" and premeditation as essential elements of first-degree murder); *see also* LaFave, *supra*, § 14.7(a) ("[T]he defendant must not only intend to kill but in addition he must premeditate the killing and deliberate about it."). While premeditation may be inferred when "the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design," LaFave, *supra*, § 14.7(a), the majority does not contend (nor could it) that this crime was notably particular or exact. Nor is it otherwise evident how one could reasonably conclude that Begay had premeditated this murder from the mere fact that he sought a clear shot at his victim. That Begay sought a clear line of sight of J.T. demonstrates that he intended to kill J.T. But if there is any "chain of logic," *Maj. Op.* at 682, that connects this evidence of intent to an inference of premeditation, it is neither discernible from the facts of this case nor from the majority's opinion. Nor, of course, is any such "chain of logic" discernible with respect to any of the other three items that the majority contends a reasonable fact-finder could conclude would support a finding of premeditation beyond a reasonable doubt. Here, the "chain of logic" is simply a legal phrase that the majority employs to justify a conclusion that it has reached, without any explanation of what it means or why it is applicable to the present case.[8]

---

[7]Indeed, confusing premeditation with intent is exactly the mistake that the majority acknowledges the prosecutor made in his closing statement. *See Maj. Op.* at 685 ("Intent is not the same thing as premeditation."). That "mistake," however, was far more important than the majority acknowledges. It may well have caused the jury to return a verdict of first-degree instead of second-degree murder.

[8]The majority's is not an unusual method of decision making or opinion writing. There are, in fact, many such legal phrases that judges simply

Fourth, the majority argues that the jury could have permissibly inferred that Begay acted with a cool mind from two related facts: first, that "Begay did not answer when, after the shooting, Clark asked what he had done," and second, that Begay told his sister to shut up after she asked him "What did you do?" *Maj. Op.* at 674. This argument starkly illustrates the insidiousness of the majority's cavalier willingness to find an "inference" of premeditation lurking behind every fact pertaining to this crime. Begay can be convicted of premeditated murder if, when asked what he has done, he responds forcefully; so, too, can he be convicted if he remains silent. Under this logic, any action Begay took subsequent to the murders could support a finding of premeditation: if he showed fear, an inference could be drawn; so too, if he demonstrated a lack of emotion. This approach not only beggars reason, but it once again shifts the burden of proof: there is no evidence regarding Begay's demeanor when, moments apart, he told his sister to shut up and failed to respond to Clark; Begay may have been acting coolly, been in a state of shock, or lost his composure; the record provides absolutely no indication one way or the other. The majority interprets the record's absence of information as to Begay's reaction to the shooting as damning to Begay, rather than to the government, which, it once again appears to forget, bears the burden of presenting evidence that affirmatively proves premeditation. Given the absence of such evidence, only through pure speculation could the jury have found Begay to have been "cool" and deliberative after the murder, rather than impulsive, or in a state of shock, or an individual who had lost control over his emotions; and certainly no rational trier of fact could have looked at the flimsy facts relating to his responses and nonresponses and found that they, along with the other dubious items of evidence, established *beyond a reasonable doubt* that Begay premeditated J.T.'s killing.

---

append to the statement of the facts before them in order to "explain" their decisions. This technique is not infrequently employed when judges purport to be evaluating what effect the evidence that a jury did not hear might have had upon its members had they heard that evidence.

This case ultimately comes down to the simple question of whether Begay's retrieving a gun from his truck is sufficient evidence to establish beyond a reasonable doubt that he premeditated J.T.'s killing. That he walked a brief distance from vehicle to vehicle for this purpose might show that he had sufficient time to deliberate coolly on the subject, but without any evidence regarding demeanor or manner, it cannot show that he in fact did so. The evidence that he tried to get a clean shot at J.T. rather than a poor one and his answer or lack of answer to a question about what he had just done have no arguable evidentiary value, circumstantial or otherwise, whatsoever. Nor, in the end, does the fact that Begay retrieved the gun from his truck. What the evidence about retrieving the gun could demonstrate to any rational trier of fact is at most that Begay might or might not have premeditated J.T.'s murder. It could not show that he deliberated with a cool mind or that he used the opportunity to develop a plan. Certainly there is nothing that would allow a juror to infer that he premeditated beyond a reasonable doubt.

The four items of evidence, whether viewed individually or collectively, are manifestly insufficient to support a conviction of murder in the first degree and would be insufficient even were there no countervailing evidence in the record. But there is indeed countervailing evidence that is far more relevant to the question of premeditation than whether, for example, Begay walked the short distance between the car and the truck or told his sister to shut up after the shooting or failed to answer Clark's question. The majority does not even consider the fact that the government's principal witness, who provided the bulk of the eyewitness testimony upon which the prosecution relied, and whom the jury obviously deemed credible, also testified that Begay was "pretty drunk" at the time of the shooting, a fact that strongly suggests the absence of premeditation. *See in re Ellis*, 356 F.3d 1198, 1219 (9th Cir. 2004) (en banc) (noting distinction between "whether defendant committed the murder with deliberation and premeditation, [or] as a result of an impulse[,] or because of

alcohol- or drug-induced diminished capacity"); *Kane v. United States*, 399 F.2d 730, 736 (9th Cir. 1968) (observing that intoxication can be "exculpatory" in a first-degree murder prosecution). By the same token, the government's witnesses, who spent the night in question with Begay, reported that they reacted with shock after he fired into the victims' vehicle, suggesting that neither Begay's demeanor nor his words or conduct on that night were those of an individual who had been planning or otherwise premeditating a murder.

The fundamental question here is whether based on the four items of evidence on which the majority relies, "any rational trier of facts [could] find guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 313. Whether any inference drawn from the evidence is a legitimate inference, or rather simple speculation, must be examined with attention to this fundamental principle of our criminal justice system. The items relied on by the majority are all, of course, consistent with the possibility that Begay premeditated J.T.'s murder, or, at the least, they are not inconsistent with that possibility. However, neither individually nor collectively do these items justify the inference that the element of premeditation has been established—that Begay actually planned or premeditated J.T.'s killing—let alone established that inference beyond a reasonable doubt.

The absence of evidence of premeditation is especially troubling in this case because, as the majority acknowledges, the government provided the jury with an erroneous statement of the law of premeditation during its closing argument, telling it that "[Begay] *intended* to kill the occupants of the vehicle. *That's premeditation*." *Maj. Op.* at 685. In light of this wholly erroneous statement of the law on the critical issue before the jury, and other similar erroneous statements the prosecution made during its closing argument, the jury may perhaps be excused for convicting Begay of first-degree murder despite wholly insufficient evidence as to premeditation. The majority, however, cannot be similarly excused for unrea-

sonably identifying as warranting an "inference" of premeditation the four items of the government's sparse factual showing, on which it relies. In sum, there is simply no evidence that Begay reflected upon, planned, or otherwise premeditated J.T.'s killing, and certainly no evidence from which a rational fact-finder could infer the necessary element of first-degree murder beyond a reasonable doubt. Surely a conviction for second-degree murder—murder with malice aforethought—should have been enough.

For all the above reasons, and more, I dissent.